United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**
No. 97-2153

| | |
|---|---|
| Alexis M. Herman, Secretary of the United States Department of Labor, | * * * |
| Plaintiff - Appellant, | * * |
| v. | * * |
| | * Appeal from the United States |
| Mercantile Bank, N.A., | * District Court for the |
| | * Eastern District of Missouri. |
| Defendant - Appellee, | * * |
| Lenco, Inc., Employees' Stock Ownership Plan & Trust, | * * * |
| Defendant - Appellee. | * |

_____

Submitted: January 12, 1998
Filed: May 1, 1998

_____

Before BOWMAN and BRIGHT, Circuit Judges, and JONES,[1] District Judge.

_____

BOWMAN, Circuit Judge.

_____

[1]The Honorable John B. Jones, United States District Judge for the District of South Dakota, sitting by designation.

Lenco, Inc., was a closely held corporation in Jackson, Missouri, that manufactured a variety of products. In 1984, Mercantile Bank was the trustee of Lenco's Employees' Stock Ownership Plan (ESOP), a plan under which Lenco employees owned Lenco stock. On April 5, 1984, Mercantile, acting as trustee of the ESOP, sold the ESOP's stock in Lenco to Jerry Ford in one of several transactions by means of which Ford acquired all of Lenco's stock. Later that day Lenco's ESOP Committee appointed Paul Mueller to replace Mercantile as trustee of the ESOP. The following day, Mueller had the ESOP buy back from Ford the Lenco stock it had sold him the day before, for the same price for which it had sold that stock. In the late 1980s Lenco began to experience financial problems, and on June 20, 1989, it filed for bankruptcy. Following Lenco's bankruptcy, the ESOP lost the vast majority of its funds.

The Secretary of Labor subsequently brought this suit against Mercantile Bank,[2] alleging that Mercantile was liable under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461 (1994), for the ESOP's buy-back of Lenco stock. The Secretary alleged that Mercantile continued to have fiduciary duties to the ESOP despite the appointment of Mueller as successor trustee and thus was liable, although Mercantile did not itself conduct the buy-back, because Mercantile failed to take action to prevent it and also because Mercantile failed to ameliorate the buy-back's consequences to the ESOP when it was reappointed trustee of the ESOP after Mueller's death in 1985. Following a bench trial, the District Court[3] entered judgment for Mercantile. The Secretary appeals.

_____

[2]The Secretary also named the ESOP as a defendant, so that full relief could be granted.

[3]The Honorable Edward L. Filippine, United States District Judge for the Eastern District of Missouri.

Mercantile can be liable for the buy-back only if the buy-back was unlawful, of course. And the buy-back was unlawful only if Mueller, who actually conducted the buy-back, violated ERISA in doing so. The Secretary maintains that Mueller violated ERISA by failing adequately to investigate the value of the stock and by purchasing the stock for more than its fair market value, thereby breaching his fiduciary duties to the ESOP.

ERISA provides that an ESOP may purchase employer stock only for "adequate consideration," which is defined as "in the case of an asset other than a security for which there is a generally recognized market [Lenco stock was such an asset because Lenco was a closely held corporation], the fair market value of the asset as determined in good faith by the trustee." 29 U.S.C. §§ 1108(e)(1), 1002(18)(B). Even if a trustee fails to make a good faith effort to determine the fair market value of the stock, "he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway." Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 919 (8th Cir. 1994). Thus, if a prudent trustee would have purchased the Lenco stock for the price for which Mueller purchased it, then Mueller did not violate ERISA, regardless of whether he made a good faith effort to determine the fair market value of the stock.

In the trial, two expert witnesses, one called by the Secretary and one by Mercantile, presented opinions on the value of Lenco stock at the time of the buy-back. These experts came to very different conclusions. Mercantile's expert testified that Mueller paid less than the fair market value of the stock, whereas the Secretary's expert testified that Mueller overpaid. After hearing these witnesses, the District Court concluded that "[e]ach expert was credible, and each expert's methodology was sufficient to survive review." Reich v. Mercantile Bank, N.A., No. 1:91CV00011 ELF, Memorandum and Order at 58 (E.D. Mo. Feb. 28, 1997). The court remained uncertain as to the precise value of the stock and as to whether Mueller paid too much. The court stated that Mueller "possibly, but not necessarily," overpaid by as much as 12.6 percent for the stock. Id. at 60. The court also found that the fair market value

-3-

of the stock, whatever it was precisely, was sufficiently close to what Mueller paid that, even if Mueller did overpay slightly, Mueller had no reason to know that he was overpaying. This amounts to a finding that a hypothetical prudent fiduciary in Mueller's place could have and would have paid what Mueller paid for the stock.

The Secretary contends that the District Court wrongly determined the value of the stock. The determination of the value of the stock is a finding of fact, and we review it for clear error. See Fed. R. Civ. P. 52(a). Mueller, acting for the ESOP, bought the stock from Ford at the same price at which Ford had bought it from the ESOP the day before. The Secretary maintains that in so doing Mueller paid too much, because the value of Lenco stock had decreased during Ford's acquisition of Lenco since Lenco had incurred substantial debt during the course of the acquisition. It may or may not be true as a general matter that, all other things being equal, an increase in debt reduces the value of a company's stock. But the record shows that all things were not equal here. Lenco used most of the debt it incurred on April 5 to redeem many shares of its stock, also on April 5. As a result of the redemption, the ESOP, which had owned 33.3 percent of Lenco's stock before Ford's acquisition, acquired 63.2 percent of Lenco's stock in the buy-back. Thus by selling its stock in Lenco and then buying it back at the same price, the ESOP was able almost to double its stake in Lenco. Mercantile's expert, taking into account Lenco's likely future earnings as of April 6, 1984, testified that the ESOP thereby improved its financial position. The Secretary's expert, moreover, admitted that a decrease in the value of a company's stock due to an increase in that company's debt may be offset by using the debt to redeem stock and thus to leave the remaining stockholders in ownership of a larger percentage of the company. The record thus amply supports the District Court's finding that Mueller paid fair market value or very close to it for the stock.

Furthermore, the District Court did not err in concluding that, although Mueller might have overpaid for the stock, he had no reason to know that he was overpaying. Determining the value of a company's stock is not an exact science. This is particularly

true of the stock of a closely held corporation such as Lenco, because there is no continuously operating market for such stock. In order to hold that Mueller did not violate ERISA in conducting the buy-back, the District Court did not need to find that Mueller bought the stock for exactly, to the penny, its fair market value; the Court merely needed to find that a prudent fiduciary in Mueller's place would have paid what Mueller paid. That is what the District Court found. We conclude that the District Court did not clearly err in finding that the value of the Lenco stock was such that a prudent fiduciary in Mueller's place would have bought the stock for the price that Mueller paid. Accordingly, Mueller did not violate ERISA in conducting the buy-back. Because the buy-back was not in violation of ERISA, Mercantile, on any theory of the case, cannot be liable for it under ERISA. We therefore need not address the issues concerning Mercantile's conduct and whether that conduct was such that Mercantile was legally responsible for the buy-back.

We affirm the judgment of the District Court.

BRIGHT, Circuit Judge, dissenting.

I dissent.

Mercantile Bank as trustee for the Employee Stock Ownership Plan ("ESOP") for Lenco, Inc. employees, performed its role so as to "hear no evil, see no evil, speak no evil."[4] As a result, the employees of the now bankrupt Lenco have lost a portion of their retirement nest egg represented by ESOP stock in Lenco. In my view, Mercantile violated its duty of trust to the employee beneficiaries of Lenco's ESOP.

_____

[4]Legend related to the "Three Wise Monkeys" carved over door of Sacred Stable, Nikko, Japan, in Bartlett's Familiar Quotations 919 (Emily Morison Beck ed., 15th ed. 1980).

Mercantile Bank focused on its own sales commission bottom line and the interests of testamentary trusts but disregarded the requirements and needs of the beneficiaries of Lenco's ESOP. As a matter of law, on the undisputed facts of this case, Mercantile violated its trust and fiduciary duties to the employee beneficiaries of the ESOP. Mercantile negotiated a sale of all of Lenco's stock to a third party who mortgaged all of the assets of Lenco. Such a sale was adverse to the interests of the employee stockholders as we explain below. That sale, however, amounted to a bonanza to the testamentary trusts beneficiaries also represented by Mercantile. Mercantile allowed the interests of the ESOP beneficiaries in Lenco to lose out to the testamentary trusts beneficiaries' interest in selling Lenco and its own interest in obtaining the maximum sale commission for selling all the stock of Lenco.

I would reverse and remand for an award of damages.

## I. BACKGROUND

Under ERISA, Congress defined an ESOP as a tax-qualified bonus plan that is designed to invest primarily in employer securities. ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6). Congress exempted ESOPs from the general requirements of ERISA that pension plans be diversified. The following three significant tax subsidies apply to an ESOP: "first, employers can deduct contributions to ESOPs; second, income earned by the plan is not taxed until distribution; third, employees can utilize certain rollover provisions not normally available to non-pension plan compensation to avoid taxation on distribution." Note, Are All ERISA Fiduciaries Created Alike?: Moench v. Robertson, 58 U. Pitt. L. Rev. 255, 258 (1996). Congress encouraged the growth of ESOPs to increase worker productivity and as a vehicle of social benefit and reform whereby workers can own part of the nation's productive assets. Id.

Lenco established its ESOP on April 1, 1974 as an employee benefit plan and employee stock ownership plan within the meaning of ERISA. Mercantile Bank acted

as trustee of the ESOP from approximately 1974 until April 5, 1984 when it resigned for several months. Mercantile resumed its role as trustee beginning approximately February 1985. As trustee, Lenco constituted a fiduciary with respect to the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

Paul Leonard owned and operated Lenco until his death in April 1981. Upon Leonard's death, Mercantile became trustee to two testamentary trusts established by Leonard which held the majority of the voting stock in Lenco as its primary asset (collectively, "testamentary trusts"). Jack Niemeyer, an Assistant Vice President in Mercantile's trust department, represented both the ESOP and the testamentary trusts on Lenco's board of directors.

In 1983, Lenco's board of directors decided to sell Lenco. Mercantile conducted a formal valuation of Lenco and determined that the value of all of Lenco's outstanding shares, plus the cost of coordinating the sale of such shares, totaled approximately ten million dollars. Lenco's board of directors agreed to set this figure as the asking price. The fixed costs of the sale estimated at $210,000 were to be paid to Mercantile for the negotiation and completion of the sale of Lenco stock. Lenco's board determined that each of the 512,683 outstanding shares would be worth approximately $19.10.

Although, twenty or thirty parties originally expressed interest in purchasing Lenco, only four parties tendered an offer. As of February 29, 1984, Jerry Ford was the only prospective buyer to meet the asking price subject to the condition that Mercantile receive "cash" for all those shares it held in trust. Shortly after Lenco's board accepted Ford's offer, Mercantile learned that Ford would be financing the transaction in part, but Mercantile determined that its condition for cash payment remained satisfied. Mercantile denies that it was then aware of Ford's plan for the ESOP to buy back all the shares from Ford with the ESOP's funds from the previous day's sale. Ford provided Mercantile with a copy of a two paragraph, preliminary commitment letter from his financing bank, Unibanc. The letter neglected to identify

any terms of the loan, its amount, its borrowing formula, or the interest rate.[5] Mercantile did nothing further to verify the financial feasibility of Ford's takeover of Lenco.

Before the closing, Ford told Mercantile that he was experiencing difficulty with arranging financing for his proposed acquisition. Ford proposed the following alternatives: Mercantile agree not to sell the ESOP's Lenco stock at the direction of the Lenco ESOP committee; Mercantile agree to sell the ESOP's Lenco stock to Ford, but to repurchase the same number of shares of Lenco stock as it sold for the same price a day later; or Mercantile agree to resign as trustee.

Ford also proposed that Mercantile sell him the ESOP stock and, after the sale, have a new trustee appointed to buy it back from him for the same price. During the negotiations leading up to the sale, Mercantile refused to change the terms of the transaction or to buy back the ESOP shares.

On April 5, 1984, Mercantile sold the ESOP stock and the two testamentary trusts' stocks to Ford for $19.10 per share. Mercantile received the negotiated commission of $200,000 for its services. On the same day as the sale, Mercantile attempted to resign as the ESOP trustee. Ford selected Paul Mueller, who served as Lenco's general counsel and corporate secretary, to replace Mercantile as the ESOP trustee. Mercantile did not investigate whether Mueller would be a suitable replacement as trustee nor inquire as to his intentions. On April 6, 1984, Mueller as trustee bought back the same shares of stock for the same price per share that the

---

[5]The Unibanc loan was secured by a general lien on all of Lenco's assets, including the company's real estate, fixed assets and accounts receivable. Marine Midland Bank later purchased the asset-based lending division from Unibanc. Marine Midland Bank placed even further restrictions on Mercantile's use of assets and cash.

ESOP had sold its shares to Ford on April 5, 1984.  The price for the shares on both occasions was approximately three million dollars.  No evidence demonstrated that

Mueller performed any independent research or evaluation of the buy-back. Mueller merely discussed the buy-back with Ford and Ford's attorney, Joe Russell. Ford testified that he and Russell never discussed having an appraisal of the stock performed before the ESOP bought back the stock because, in Ford's view, the price of the stock was established by his purchase the day before.

Before the ESOP sold its stock to Ford, the ESOP owned 33.3% of the outstanding stock. The next day, when the ESOP bought back the stock for the same price per share, it owned 63.2% of the outstanding stock because Lenco had used most of the proceeds of the Unibanc loan to Lenco to redeem 230,826 of its previously outstanding shares mostly held by Ford.[6] Even though the ESOP now owned a greater stake in Lenco, Lenco now had extraordinary debt, restrictions on its cash flow as a condition of the Unibanc loan, and greatly reduced equity. Before the leveraged buyout, Lenco's total liabilities equaled $1,917,442. After the buyout, Lenco's total liabilities tripled to an amount exceeding six million dollars. Before the buyout, Lenco reported an equity (book) value of $5.4 million. The Unibanc loan of $5.25 million almost wiped out this equity. Ford added no assets or other equity as part of the buyout. Thus, Lenco went from a substantial business with over five million dollars in equity to a corporation with great debt and practically no equity.[7]

---

[6]Ford received $19.32/share for his stock, for a total of $4,076,510. This redemption and the sale back to the ESOP allowed Ford to purchase Lenco with little personal debt. Ford's remaining Lenco shares gave him control of the corporation. The ESOP before and after the transaction only owned non-voting shares of Lenco.

[7]Some computations might show some equity after the sale to Ford and the complete mortgaging of Lenco's assets. But in any event, the book value had been greatly reduced as Lenco became saddled with heavy debt.

## II.    DISCUSSION

A district court's findings of fact are reviewed for clear error.  Prince v. Sargent, 960 F.2d 720, 720 (8th Cir. 1992) (per curiam).  Conclusions of law and mixed questions of law and fact are reviewed de novo.  Cooper Tire & Rubber Co. v. St. Paul Fire & Marine Ins. Co., 48 F.3d 365, 369 (8th Cir. 1995).

This court in Martin v. Feilen, 965 F.2d 660, 664 (8th Cir. 1992), stated that "[b]orrowing from trust law, ERISA imposes high standards of fiduciary duty upon those responsible for administering an ERISA plan and investing and disposing of its assets."  Under ERISA § 1104(a)(1), "the ERISA fiduciary must act 'solely in the interest of the participants and beneficiaries' of the plan, 'for the exclusive purpose' of providing benefits to them, and 'with the care, skill, prudence, and diligence' of a 'prudent man acting in a like capacity and familiar with such matters.'"  Id. at 670.

ERISA §§ 406(a)(1)(A) and (D), 29 U.S.C. §§ 1106(a)(1)(A) and (D), prohibit a plan from buying or selling securities issued by the plan's employer sponsor because such transactions carry an inherent risk of "self-dealing" and "conflicts of interest."  However, Congress created § 408(e) of ERISA, 29 U.S.C. § 1108(e), to provide a narrow exemption to the § 406(a) prohibition.  Section 408(e) permits employee benefit plans to purchase or sell employer securities only if the sale or purchase of the securities is for adequate consideration.  The definition of "adequate consideration" under ERISA imposes a two-fold requirement:  (1) the price paid must reflect the fair market value of the asset, and (2) the trustee must conduct a careful and independent investigation of the circumstances prevailing at the time of the investment.  Donovan v. Cunningham, 716 F.2d 1455, 1467-68 (5th Cir. 1983).

The district court erred as a matter of law in concluding that a conflict of interest did not exist and that Mercantile did not have a duty to make an independent investigation of the transactions at issue.  A conflict of interest existed both before

-11-

Lenco's board decided to sell the corporation and during the sale transaction. The district court noted that both the ESOP beneficiaries and the testamentary trusts beneficiaries wanted the maximum amount per share of Lenco stock. However, a sale of the ESOP stock at the maximum amount per share did not constitute the primary objective of the ESOP beneficiaries. A conflict of interest between the ESOP beneficiaries and the testamentary trusts beneficiaries existed because the ESOP beneficiaries as employees were primarily interested in Lenco continuing as an ongoing profitable business providing them employment and an increase in stock ownership.

> "When a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions." Schaefer v. Arkansas Medical Soc'y, 853 F.2d 1487, 1492 (8th Cir. 1988), citing Donovan v. Bierwirth, 680 F.2d 263, 271 (2d Cir.), cert. denied, 459 U.S. 1069 (1982). Thus, the ESOP fiduciary is not prohibited from being on both sides of a transaction involving the ESOP's assets, but he must serve both masters (or at least the ESOP) with the utmost care and fairness.

Martin, 965 F.2d at 670. The sale of ESOP stock and the proposed leveraged buyout of Lenco obviously affected the future and financial soundness of Lenco. As trustee of the ESOP, Mercantile had a duty to investigate the proposed transaction and the transferee with care.

The district court erred in concluding that the sale of stock on April 5, 1984 did not constitute the type of "investment" which triggers close investigation mandated by Martin. This court has concluded that "ERISA imposes high standards of fiduciary duty upon those responsible for administering an ERISA plan and investing and disposing of its assets." Martin, 965 F.2d at 664 (emphasis added). Especially in the context of an ESOP, the disposition of stock in the employer company constitutes a type of investment which must be in the best interests of the beneficiaries. In this case,

the ESOP plan document contemplated investment only in Lenco stock. Accordingly, any removal of that stock from the ESOP trust should trigger high scrutiny by a fiduciary.

When Lenco's board started to discuss a sale of Lenco, Mercantile should have resigned as trustee of either the ESOP trust or the testamentary trusts. Mercantile failed to recognize that the ESOP beneficiaries had different interests than those of other stockholders. The ESOP beneficiaries as employee stockholders were primarily interested in having a going corporation with a solid financial base. Congress created ESOPs as a statutory pension program designed to promote investment of employee retirement assets in the stock of the employer. In fact, courts have recognized a presumption in favor of finding ESOP fiduciaries acted prudently when they invest only in the stock of the employer. Moench v. Robertson, 62 F.3d 553, 571 (3d Cir. 1995), cert. denied, 516 U.S. 1115 (1996). In this way, ESOP programs allow a shift in ownership of the nation's productive assets to workers. This program can serve a dual purpose. High productivity by employees benefits both the employer and the employees themselves as beneficiaries of an ESOP because high productivity ordinarily improves profitability.

The testimony by the Secretary's expert, Dr. Murray, further demonstrated the conflict between the interests of the testamentary trusts beneficiaries and the ESOP beneficiaries. Dr. Murray testified that a conflict existed due to different time horizons. The ESOP beneficiaries looked for growth and development on a long-term basis while the testamentary trusts beneficiaries wanted current income and a highly liquid company. Dr. Murray concluded that the differences between the needs and objectives of the testamentary trusts beneficiaries and the ESOP beneficiaries were so clear and persistent that no trustee should have served both beneficiaries. This testimony is in accord with the statutes and legislative history relating to ESOPs.

After deciding to sell Lenco, Mercantile committed its second breach of fiduciary duty by failing to investigate whether the details of the sale transaction would advantage the ESOP employee beneficiaries.[8]  Specifically, Mercantile failed to investigate the financing arrangement and the qualifications of the new owner. Mercantile ignored numerous warning signs that Ford could not afford to have the ESOP included in the sale and that Ford did not have the experience to lead the company.

Mercantile did not investigate at all the propriety of a sale to Ford given the heavy Unibanc financing.  Dr. Murray testified that Mercantile as a prudent fiduciary should have reviewed the loan agreement, the history of the transaction with the buyer's representatives, the borrowing formula, and satisfied itself that Ford had the financial resources to carry through with the transaction.  An investigation by Mercantile would have shown no major bank was going to participate in the buy-back.  As part of the deal for Ford to buy the ESOP stock on April 5, 1984, a twenty-four-hour loan was guaranteed by a collection of four individuals who called themselves Exchange Financial Services.  Ford paid this loan the next day when Mueller bought the same shares back for the ESOP.

Lenco borrowed over five million dollars from Unibanc.  In essence over four million dollars of the Unibanc loan went to Ford to help him acquire Lenco.  That money did not benefit Lenco, but only Ford personally.  Furthermore, the terms of the Unibanc loan demonstrate the difficult financial position Ford imposed upon Lenco.

---

[8]The district court incorrectly stated that the Secretary wanted to hold Mercantile liable because the scheme left Lenco highly leveraged which ultimately lead to its bankruptcy.  The argument made by the Secretary did not focus upon the eventual bankruptcy of Lenco in 1989.  Rather, the Secretary presented the argument that Mercantile should be held liable for a transaction that was not in the best interests of the beneficiaries in 1984.

The Unibanc loan required a general lien on all of Lenco's assets, including the company's real estate, fixed assets and accounts receivable.

Mercantile did not investigate Ford's background to determine if he could effectively operate Lenco, a multimillion dollar manufacturing business. An investigation would have shown that Ford had no pertinent experience. According to Ford's resume, his previous employment included owning and operating a real estate development company, operating a funeral home, and serving as a state legislator. Ford's personal liquid assets consisted of $5000. As far as Mercantile was concerned, it did not care about the experience or financial acumen of the next CEO of Lenco.

Mercantile breached its fiduciary duty to the ESOP by failing to investigate the transaction. After investigation, a prudent fiduciary in Mercantile's shoes would have stopped the transaction from being completed. Mercantile's conflicting duty to the testamentary trusts, which had an interest in the Ford transaction being completed and getting cash for the stock held by the trusts, caused Mercantile to avoid its duty to protect the ESOP from participating in a transaction harmful to the interests of the ESOP. Mercantile obviously desired to get the money for the shares and run from further responsibility, which it did.

Mercantile committed a third breach of fiduciary duty when it failed to correct the harm caused by the stock buy-back when it resumed trusteeship of the ESOP. The district court clearly erred by determining that the stock buy-back by Mueller for the ESOP constituted a prudent transaction for adequate consideration. In calculating the fair market value of Lenco, the district court clearly erred by not taking into account the

extraordinary debt.[9]  Moreover, I think the expert testimony at the trial as to the value of the stock is relatively immaterial.  The district court should have valued the

_____

[9]In addition, in a bankruptcy action, the parties stipulated that the ESOP purchase of the stock was for more than adequate consideration and would subject Lenco to liability.  In re Lenco, Inc., 116 B.R. 141, 143 (Bankr. E.D. Mo. 1990).

ESOP stock according to the formula in the ESOP plan document. This formula called for a combination of a price-earnings and a book value method of valuation. With the extraordinary debt, the book value approached zero. The price-earnings based on past performance were not reliable, as Ford, a new person without experience, was taking control of Lenco. The value of the corporation was obviously greatly lessened. A court does not need an expert witness to either demonstrate or refute what is obvious.

Mercantile successfully asserted in the district court that Mueller paid fair market value for the former ESOP stock. That contention and the district court's confirming conclusion flies in the face of reality. The real issue is whether Mercantile or any prudent trustee would consider the stock to have the equivalent value on April 6, 1984 as it did on April 5, 1984. On April 5, 1984, the corporation was a successful business with good leadership and little debt, but the next day, the corporation had untested leadership and heavy debt. Notwithstanding that the ESOP almost doubled its interest in the company, the company's value was far less and the ESOP lacked control of the company. I suggest a trust company or investment advisor making this sort of business decision would be short-lived. Interestingly, prior to the sale of the stock, Mercantile rejected Ford's overtures that Mercantile as trustee buy back the ESOP shares one day after the sale. If the buy-back did not serve the best interests of the employees then, that action cannot be justified in this lawsuit. Thus, I conclude that, as a matter of law on the undisputed facts, the stock buy-back constituted an imprudent investment.

## III.   CONCLUSION

The district court erred in concluding that Mercantile did not breach its fiduciary duties of loyalty and prudence when it failed to appoint a new independent trustee or to investigate the proposed sale of ESOP stock to Ford. Moreover, as a matter of undisputed fact, the buy-back amounted to an imprudent investment by trustee Mueller.

Although the majority absolves Mercantile from liability, the relation in this dissent of the facts and law may serve some beneficial purpose. The courts, I believe, should take a hard look at those individuals or corporations who manipulate ESOP shares for the advantage of people other than the employee beneficiaries. Fiduciaries should carefully safeguard the interests of the ESOP beneficiaries in ESOP plans. I would remand this case to determine an appropriate amount of damages to be paid by Mercantile for its breaches of fiduciary duty.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT