Secretary's valuation of the Hall Holding stock which were in issue at a very early stage in this litigation.

Finally, a district court is given wide latitude in compensating the participants in an ESOP when a breach of fiduciary duty has been shown. "[I]t is 'clear that Congress intended to provide the courts with broad remedies for redressing the interests of participants and beneficiaries when they have been adversely affected by breaches of a fiduciary duty.'" *Donovan v. Bierwirth*, 754 F.2d at 1055 (quoting *Eaves v. Penn*, 587 F.2d 453, 462 (10th Cir. 1978) (citing S. REP. NO. 93-127, *reprinted in* 1974 U.S.C.C.A.N. 4838, 4871)). Because defendants have provided no authority to show that the district court erred in awarding money damages to compensate the participants in the Hall Chemical ESOP, the Court finds that the award granted by the district court shall stand.

### V. CONCLUSION

For the above-stated reasons, the district court properly granted the Secretary's motion for summary judgment. Consequently, the decision of the district court is **AFFIRMED.**

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0107P (6th Cir.)
File Name: 02a0107p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――

ELAINE L. CHAO, Secretary of
the United States Department
of Labor,
     *Plaintiff-Appellee,*

     *v.*

HALL HOLDING COMPANY,
INC., DAVID L. GOLDMAN,
KATHLEEN A. KEATING,
GEORGE A. AHEARN,
MICHAEL F. SHIELDS, and
GOLDMAN FINANCIAL GROUP,
INC.,
     *Defendants-Appellants.*

Nos. 99-4142;
00-3041

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 94-02236―Ann Aldrich, District Judge.

Argued: March 14, 2001

Decided and Filed: April 3, 2002

1

Before:  NORRIS and DAUGHTREY, Circuit Judges;
         ZATKOFF, Chief District Judge.[*]

---

**COUNSEL**

---

**ARGUED:**  Edward A. Scallet, GROOM LAW GROUP, Washington, D.C., for Appellants.  Edward D. Sieger, UNITED STATES DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR, Washington, D.C., for Appellee. **ON BRIEF:**  Edward A. Scallet, GROOM LAW GROUP, Washington, D.C., Michael J. Frantz, FRANTZ WARD LLP, Cleveland, Ohio, Katherine S. Kamen, LeBOEUF, LAMB, GREENE & MacRAE, Washington, D.C., for Appellants. Edward D. Sieger, Nathaniel I. Spiller, UNITED STATES DEPARTMENT OF LABOR, OFFICE OF THE SOLICITOR, Washington, D.C., for Appellee.

---

**OPINION**

---

LAWRENCE P. ZATKOFF, Chief District Judge. Plaintiff-Appellee Elaine L. Chao,[1] Secretary of the United States Department of Labor, brought this action against Defendants-Appellants, Hall Holding Company, Inc., David L. Goldman, Kathleen A. Keating, George A. Ahearn, Michael F. Shields, and Goldman Financial Group, Inc. In her complaint, the Secretary alleged that various components

---

[*] The Honorable Lawrence P. Zatkoff, Chief United States District Judge for the Eastern District of Michigan, sitting by designation.

[1] Pursuant to FED. R. CIV. P. 25(d)(1), Secretary Chao has been substituted as a party for Alexis M. Herman.

Benefits such as an ESOP "are not a gratuity, *see Inland Steel Co. v. NLRB*, 170 F.2d 247 (7th Cir. 1948), *cert. den.* 336 U.S. 960, 69 S. Ct. 887, 93 L. Ed. 1112 (1949), but a form of deferred wages." *Reich v. Valley Nat. Bank of Arizona*, 837 F. Supp. 1259, 1286-87 (S.D.N.Y. 1993).  Defendants, by arguing that the initial price of the stock does not matter, essentially ignore the fact that the money paid for the Hall Holding stock was a form of deferred compensation for the participants in the Hall Chemical ESOP.  However, because the Hall Chemical ESOP overpaid for the shares of Hall Holding stock, it suffered a loss.  Consequently, this argument, like the others, cannot stand.

**2. The District Court's Remedy**

Defendants' final argument is that the district court, in distributing cash to the Hall Chemical ESOP participants "would constitute . . . benefits for the ESOP participants that they never earned nor expected, nor, more seriously, could obtain legally under the Internal Revenue Code."  Again, this argument must also fail.

First, defendants' statement that the Hall Chemical ESOP participants did not earn the benefits is simply not true.  As stated previously, benefits such as an ESOP "are not a gratuity . . . but a form of deferred wages." *Valley Nat. Bank*, 837 F. Supp. at 1286-87.  Second, although it is true that at the inception of the Hall Chemical ESOP, the participants may not have anticipated a cash distribution, they certainly did anticipate paying adequate consideration, and nothing more, for the stock in Hall Holding.  However, because of defendants' actions, the Hall Chemical ESOP overpaid for the stock by more than $1 million.  Third, defendants argue, with no citation to authority, that such a distribution would violate the Internal Revenue Code.  Defendants only refer the Court, with no explanation, to a litigation report submitted to the district court.  However, a cursory review of the report shows that it does not even contemplate the figures at issue on appeal.  Instead, it deals with figures based upon the

Defendants also raise another baffling argument in their brief: "[F]rom the perspective of the ESOP participants, the beginning price of their stock is irrelevant; what counts is what the stock is worth when they retire." Again, this argument fails to realize the realities of investing. The participants in the Hall Chemical ESOP have every incentive to purchase the stock at the lowest possible price. Had the stock been purchased at a lower price, the plan participants could have purchased more shares and realized a larger return. For example, suppose two investors each have $100.00 to invest. Investor A purchases 10 shares of X corporation at $10.00 a share while investor B purchases 5 shares of X corporation at $20.00 a share. A few years later, both investors wish to sell their stock when a share is selling for $50.00. Investor A now has 10 shares worth $500.00 dollars, representing a profit of $400.00, whereas investor B has 5 shares worth $250.00, representing a profit of $150.00 dollars.

This example demonstrates two things. First, a plan participant is definitely concerned with the value of Hall Holding Stock at the time he or she retires. However, defendants are wrong in asserting that this is the participants' only concern. This is because the example also demonstrates that an investor is also concerned with the price that he or she must pay to purchase the stock as it directly affects the return a participant could hope to receive.

Finally, defendants make the following statement:

Under either the actual price or the district court's version of fair market value, the ESOP would still own 9.96% of Hall Holding and the participants would be in the exact same position they are in today: they would have exactly the same number of shares in their accounts valued at whatever those shares are worth today.

The difficulty with this argument is that it again gives no consideration to the original price paid for the shares.

of an employee stock ownership plan (hereinafter "ESOP")[2] for the benefit of employees of a subsidiary of Hall Holding Company violated the Employee Retirement Income Security Act (hereinafter "ERISA"), 29 U.S.C. § 1001, *et seq*. Specifically, the Secretary alleged that defendants breached their fiduciary duties by purchasing stock on the ESOP's behalf without adequate investigation and by overpaying for the stock. The district court agreed with the Secretary's position, and granted her motion for summary judgment, finding *inter alia*: (1) defendants, as fiduciaries, failed to conduct a prudent and independent investigation to determine the fair market value of the stock; (2) a showing of harm or loss is not an element of a claim under 29 U.S.C. § 1106(a)(1); and (3) defendants owed the employee stock ownership plan $1,049,549.00, plus interest, which represented the difference between the amount originally paid for the stock and the fair market value of the stock as determined by the district court. For the reasons that follow, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Substantive Facts

Prior to 1986, defendant Goldman Financial Group, Inc. (hereinafter "defendant GFGI") was a broker that would help business entities buy and sell other businesses. However, in 1986, defendant GFGI began purchasing and holding companies for its own account. As alleged in the Secretary's complaint, the owners of defendant GFGI are David L. Goldman (hereinafter "defendant Goldman") and a trust benefitting defendant Goldman's children.

In the summer of 1988, defendant GFGI purchased Hall Chemical Company (hereinafter "Hall Chemical") through

_____

[2]An ESOP is an employee benefit plan that primarily invests in securities of the employer. *Kuper v. Iovenko*, 66 F.3d 1447, 1457 (6th Cir. 1995).

Hall Holding Company (hereinafter "Hall Holding") for approximately $21 million. Hall Holding is a subsidiary of defendant GFGI and a holding company whose primary asset is Hall Chemical. Defendant Goldman was the sole director of Hall Holding. The president of Hall Chemical was George A. Ahearn (hereinafter "defendant Ahearn") and its Vice-President of Finance and Chief Financial Officer was Michael F. Shields (hereinafter "defendant Shields"). Defendant Ahearn and defendant Shields were also the trustees of the Hall Chemical employee stock ownership plan (hereinafter "Hall Chemical ESOP"). After the acquisition of Hall Chemical, Hall Holding owned 95% of Hall Chemical, and defendant Ahearn had the right to acquire the remaining 5%.

The final defendant is Kathleen A. Keating (hereinafter "defendant Keating"), the Director of Human Resources for defendant GFGI. After the purchase of Hall Chemical, defendant Keating was tasked with analyzing its compensation programs. As a result of her analysis and a meeting with a benefits consulting firm, defendant Keating made a number of recommendations, including the establishment of the Hall Chemical ESOP. Although defendant Goldman did not want to sell any stock, he was eventually persuaded that creation of the Hall Chemical ESOP was a good idea.

In order to set up the Hall Chemical ESOP, defendant Keating retained attorney James Shumaker of Choate, Hall & Stewart in Boston, Massachusetts, whom she described as "very well regarded in the Boston area as sort of a senior ERISA specialist." Throughout the summer of 1990, defendant Keating and Shumaker spoke on a daily basis about the Hall Chemical ESOP. Shumaker advised defendant Keating that an independent appraisal should be completed by a qualified independent appraiser. Consequently, defendant Keating contacted James Cunningham about the appraisal. Although defendant Ahearn referred to Cunningham as "probably the premiere of analysts, Wall Street analyst of specialty chemical companies," Cunningham had never

when they become entitled to receive distributions from the ESOP.

(Emphasis in original). The Court is at a loss to understand defendants' argument. It appears as though defendants are arguing that at the time the shares of stock are transferred from an employer to the ESOP, it is in an employee's benefit to have the stock at the highest possible price. This makes little sense. At the time the ESOP acquires the stock, it is in the ESOP participant's best interest to do so at the lowest price possible. The lower the price of the stock, the more shares that can be purchased by the ESOP, assuming the investor will invest the same amount without regard to the price per share. Further, a higher return on investment can be generated with a lower purchase price.

Although it is true that in the present case defendant GFGI and defendant Goldman only wished to sell 9.96% of Hall Holding stock, it is easy to see why a lower stock price would benefit the ESOP in a factual scenario similar to the present case. In the present case, the transaction was structured as a leveraged ESOP. In order to complete the transaction, the Master Trust loaned the Hall Chemical ESOP $3.5 million to purchase the shares. As the district court explained in its initial opinion, the 110 shares of Hall Holding were placed in a suspense account. *See Hall Holding*, 990 F. Supp. at 957. Hall Chemical made cash contributions which were used to retire the $3.5 million loan. As each payment was made, a corresponding amount of stock was released from the suspense account and placed into the individual participant's accounts. Assuming that the Hall Chemical ESOP would have paid the amount the district court determined was proper, $2,450,451.00, the participants in the Hall Chemical ESOP would have benefitted. Because the amount of the debt would have been more than $1 million less than the actual purchase price of $3.5 million, it could have been retired much more quickly. Consequently, participants in the Hall Chemical ESOP would have been fully vested in the 110 shares of Hall Holding stock sooner.

remains that defendants make no argument in their reply brief as to the violation of § 406(a)(1)(A), which has no subjective intent requirement. Therefore, the Court affirms the district court's decision based upon its finding of a violation of § 406(a)(1)(A).

## D. Defendants' Third Claim of Error

Defendants' third claim of error deals largely with the district court's award of monetary damages. Because defendants' arguments are based upon faulty premises, and because they fail to cite any authority for their claims, they must fail.

### 1. Defendants' Arguments Concerning the Structure of Leveraged ESOPs

Simply put, defendants make arguments in their brief which would confound any rational investor. For example, defendants make the following claim:

First and perhaps foremost, the ESOP participants do not have a direct interest in obtaining the lowest possible price for the stock at the inception of the ESOP since their ownership does not occur until later. Indeed, the moment the sale takes place, the ESOP participants' only interest is in obtaining the *highest* possible price since they are going to be sellers of the stock in the future

'prohibited transactions' that represent per se violations of fiduciary duty."); Leslie L. Wellman & Shari J. Clark, *An Overview of Pension Benefit and Fiduciary Litigation under ERISA*, 26 W ILLAMETTE L. REV. 665, 700 (1990) ("The object of [§ 406] was to make illegal per se the types of transactions that experience had shown to entail a high potential for abuse."); Alan P. Woodruff, ERISA LAW ANSWER HANDBOOK, Q 7:7 (3d ed. 2001) (explaining that good faith is no defense to a violation of § 406 because the section contemplates per se violations); Matthew M. O'Toole, Comment, *The Disproportionate Effects of an ESOP's Proportional Voting*, 85 N.W. U. L. REV. 824, 857 (1991) (describing violations under § 406 as per se violations).

"perform[ed] a valuation with regard to a subject company where an ESOP was purchasing an interest."

By way of background, Cunningham was employed by The First Boston Corporation. During his employ, he was asked to value defendant GFGI and its various properties, which included Hall Chemical. This was several months prior to the formation of the Hall Chemical ESOP. Cunningham completed this valuation in the spring of 1990. Soon after completing his valuation, Cunningham left The First Boston Company. After leaving, he was again contacted by defendant GFGI about completing a second valuation of Hall Chemical. Cunningham stated that he would complete a second valuation, but that his main priority was to find a job. Cunningham also explained that he would not be willing to inflate his first valuation of Hall Chemical. Finally, Cunningham said that he would consider any new information, but that he did not expect that this would "materially change" the prior valuation. These terms were acceptable to defendant GFGI.

In completing the second valuation, Cunningham explained that he performed a valuation of 100% of Hall Chemical. Although someone may have mentioned something about an ESOP, Cunningham stated that his only job was to value Hall Chemical. Further, Cunningham stated that if he had been asked to determine "how much an ESOP should pay for stock in a company," his valuation would have been different. In any event, Cunningham completed his second valuation of Hall Chemical in August 1990. His valuation determined that Hall Chemical was worth between $32.4 and $37.4 million, exclusive of debt, which the district court noted was consistent with his first valuation. *See Reich v. Hall Holding Co., Inc.*, 990 F. Supp. 955, 958 (N.D. Ohio 1998).

Upon receiving Cunningham's second valuation, defendant Keating distributed it to several people, including defendant Ahearn, defendant Shields, Shumaker, and other people at defendant GFGI, whom defendant Keating believed to include

defendant Goldman.  After some discussion with Shumaker, changes were made to the valuation so that it would comply with proposed regulations concerning stock purchases by ESOPs.  A finalized version of Cunningham's report was signed and dated September 5, 1990.

At this point, defendant Keating was left to determine a price to pay for the shares to be purchased by the Hall Chemical ESOP.  During her deposition, defendant Keating explained how the eventual purchase price of $3.5 million was determined.  First, the numbers of the valuation range, $32.4 and $37.4 million, were added and then divided by two.  The resultant figure, $34.9 million, was multiplied by the amount of stock to be purchased, which defendant Keating erroneously said was 9.9%.[3]  The product of these two numbers was $3.4551 million.  However, instead of using $3.4551 million as the purchase price, it was determined to be $3.5 million.  Defendant Keating explained:

> Given these values, I would do exactly the same number today, which is almost directly in the middle except it's a round number, so for purposes of communication, purposes of the documentation, it just would work better at 3.5 million than 3.[4551], which is, after all, you know, you know, .1 percent of the transaction or something that we're talking about here.

When asked who was involved in determining the $3.5 million figure, defendant Keating responded that defendant Goldman and another person at defendant GFGI would have been involved.  Defendant Keating was then specifically asked what defendant Goldman's involvement was in the determination of the $3.5 million figure, to which she responded: "He had to be willing to sell the stock at a price."

---

[3]The actual percentage of stock purchased by the Hall Chemical ESOP was 9.96%.  *See infra* notes 6, 7, and 11.

---

provisions. [Section 406] sets forth certain transactions that are prohibited *per se*."); *Gray v. Briggs*, 45 F. Supp.2d 316, 326 (S.D.N.Y. 1999) ("The transactions covered by Section 406(a)(1) 'are per se violations of ERISA regardless of the motivation which initiated the transaction, the prudence of the transaction, or the absence of any harm arising from the transaction.'" (quoting *Reich v. Polera Bldg. Corp.*, No. 95 Civ. 3205, 1996 WL 67172, * 2 (S.D.N.Y. Feb. 15, 1996))); *Metzler v. Solidarity of Labor Org. Health & Welfare Fund*, No. 95 CIV. 7247, 1998 WL 477964 (S.D.N.Y. Aug 14, 1998), *aff'd Herman v. Goldstein*, 224 F.3d 128 (2d Cir. 2000), *cert. denied Goldstein v. Chao*, ___ S. Ct. ___, 2001 WL 290239, (U.S. June 25, 2001) (referring to the per se prohibitions in § 406); *Polera Bldg Corp.*, 1996 WL 67172, * 2 ("Congress made it a per se violation of ERISA to conduct transactions [set forth in § 406(a)(1)] because they inherently compromise the duty of trust that is imposed on a fiduciary."); *Reich v. Valley Nat. Bank of Arizona*, 837 F. Supp. 1259, 1281 (S.D.N.Y. 1993) (explaining that actions taken in good faith which violate § 406 are still a violation because this is a per se rule); *McDougall v. Donovan*, 552 F. Supp. 1206, 1215 (N.D. Ill. 1982) ("[i]t is apparent that Congress intended § [406] to be virtually a *per se* prohibition against the enumerated transactions."); Gina Marie Agresta-Richardson, *"Employee Stock Ownership Plans: Uncertainties Plaguing the Duties of the ESOP Fiduciary with Respect to Voting and Defensive ESOPs"*, 14 AKRON TAX J. 91, 103 (1999) (footnotes omitted) ("ERISA § 406 imposes a list of prohibited transactions.  Engaging in these transactions is a per se violation of ERISA."); Michael J. Collins, *It's Common, but is it Right?  The Common Law of Trusts in ERISA Fiduciary Litigation*, 16 LAB. LAW. 391, 396 (2001) ("[S]ection 406 of ERISA delineates specific categories of transactions that are deemed to per se violate the fiduciary responsibility rules."); Ronald J. Cooke, ERISA PRACTICE AND PROCEDURE, § 6.12 (2d ed. Supp. 2000) (footnote omitted) ("In essence, the prohibited transaction rules of ERISA § 406 develop a per se rule prohibiting certain transactions between a plan and a party in interest."); Emmalind Garcia, *ERISA: Its Fiduciary Duties and Investments for Social Purposes*, 23 REV. JUR. U.I.P.R. 53, 73 (1988) (Section 406(a) "covers per se prohibitions"); James F. Jorden, Waldemar J. Pflepsen, Jr. & Stephen H. Goldberg, HANDBOOK ON ERISA LITIGATION, § 3.03[B][1] (2d ed. Supp. 2000) (footnotes omitted) ("Prohibited 'party in interest' transactions are often characterized by the courts as 'per se' violations of ERISA because liability may be imposed even where such transactions are entered into in good faith, where such transactions would be found to be prudent under ERISA's prudence standard, and where no harm results to the plan."); Howard Pianko & Stephen J. Nelson, *Special Issues Involving Broker-Dealers and their Employee Benefit Plan Clients*, 23 REAL PROP. PROB. & TR. J. 749, 756 (1988) ("ERISA section 406 contains a list of

*foundations, and amended these definitions of prohibited transactions for the most part to prohibit outright questionable transactions* between the trust and interested parties.  The committee's bill generally follows the approach that was developed in 1969, *establishing definitions for prohibited transactions that will make it more practical to enforce the law.* The committee's definitions of prohibited transactions, and the exceptions from these definitions, however, are designed to take account of the unique situation of employee benefit trusts.

S. REP. NO. 93-383, *reprinted in* 1974 U.S.C.C.A.N. 4890, 4979 (emphasis added).  Although the Senate Report does not state that the prohibited transactions set forth in § 406(a)(1) are per se violations, it does note that the concern was to avoid "sporadic and uncertain effectiveness," which is the result of a per se rule. *Id.* Further, the Senate Report notes that the intent was to "prohibit outright" these types of transactions. *Id.* Finally, the Congress was concerned with practical enforcement of the prohibited transactions. *See id.* Such legislative history evinces Congress's intent to create per se violations in § 406(a)(1).

Finally, the Court is also concerned that requiring subjective intent for a violation of § 406(a)(1)(D) is against the great weight of authority. Most courts and commentators have found that § 406(a) contemplates per se violations. *See Etter v. J. Pease Const. Co., Inc.*, 963 F.2d 1005, 1010 (7th Cir. 1992) (stating that no injury was required "for a court to find a transaction prohibited or otherwise impermissible"); *Brock v. Citizens Bank of Clovis*, 841 F.2d 344, 347 (10th Cir. 1988) (referring to the transactions listed in § 406 as per se violations); *Leigh v. Engle*, 727 F.2d 113, 123 (7th Cir. 1984) ("The *per se* rules of section 406 make much simpler the enforcement of ERISA's more general fiduciary obligations." (citing S. REP. NO. 93-383, *reprinted in* 1974 U.S.C.C.A.N. 4890, 4979)); *Donovan v. Cunningham*, 716 F.2d 1455, 1464-65 (5th Cir. 1983) ("The object of Section 406 was to make illegal per se the types of transactions that experience had shown to entail a high potential for abuse."); *M & R Inv. Co., Inc. v. Fitzsimmons*, 685 F.2d 283, 287 (9th Cir. 1982) ("The party-in-interest prohibitions act to insure arm's-length transactions by fiduciaries of funds subject to ERISA.  A transaction with a party in interest is prohibited under the presumption that it is not arm's-length. The result is a broad per se prohibition of transactions ERISA implicitly defines as not arm's-length."); *Eaves v. Penn*, 587 F.2d 453, 459 (10th Cir. 1978) (noting that under certain circumstances, a fiduciary may be released from the per se violations enumerated in § 406); *Huffer v. Herman*, No. C2-00-897, 2001 WL 345455, at * 6 (S.D. Ohio Apr 09, 2001) ("[T]here is no 'good faith' exception to ERISA's fiduciary

After the $3.5 million figure was decided upon, it was taken to defendant Goldman for his approval, which was given. The next step was to prepare the Hall Chemical ESOP documents, which were entitled The Hall Chemical Company Employee Stock Participation Plan.  Once prepared, these documents provided that Hall Holding was the administrator and named fiduciary.  As the sole member of Hall Holding's Board of Directors, defendant Goldman had the authority to appoint individuals to administer the Hall Chemical ESOP and to appoint trustees to invest plan assets.  In this capacity, defendant Goldman appointed defendant Ahearn and defendant Shields as members of the committee which served as administrator of the Hall Chemical ESOP for purposes of ERISA.  Further, defendant Ahearn and defendant Shields were appointed trustees of the Hall Chemical ESOP.  In this capacity, they secured a loan[4] in the amount of $3.5 million from a Master Trust[5] sponsored by defendant GFGI. The loan amount was used to purchase 9.96%[6] of the stock in Hall Holding, not Hall Chemical, the company valued by Cunningham.

---

[4]The use of a loan to fund an ESOP is referred to as a leveraged ESOP.  As the district court explained, an ESOP borrows money to make an initial purchase of stock.  Then, an employer contributes money until the debt is retired.  *See Hall Holding*, 990 F. Supp. at 957 (citing *Donovan v. Cunningham*, 716 F.2d 1455, 1459 (5th Cir. 1983)).  Further, in the present case, the Hall Holding stock was placed in a "suspense account."  As the Hall Chemical ESOP made debt payments with the employer contributions, a corresponding amount of stock was released from the suspense account and placed in the Hall Chemical ESOP participant's accounts.  *See id.*

[5]As the district court explained, the Master Trust held the assets of other pension plans related to defendant GFGI. *See Hall Holding*, 990 F. Supp. at 958.

[6]The 9.96% figure was reached after defendant Keating consulted with Shumaker.  Shumaker opined that a loan from the Master Trust to the Hall Chemical ESOP would not violate ERISA so long as less than 10% of the stock of Hall Chemical was purchased.

On September 21, 1990, defendant Ahearn and defendant Shields offered to purchase, for the Hall Chemical ESOP, 110 shares, or 9.96%, of Hall Holding stock for $3.5 million. Defendant Goldman accepted the offer, and 110 shares of Hall Holding, not Hall Chemical, were sold to the Hall Chemical ESOP.

## B. Procedural History

On January 9, 1998, the United States District Court for the Northern District of Ohio ruled on the Secretary's motion for partial summary judgment and on defendants' motion for summary judgment and partial summary judgment. In denying both motions, the district court found: (1) defendants' actions were fiduciary decisions subject to ERISA, not sponsor/corporate decisions; (2) defendants' contributions to the Hall Chemical ESOP were not gifts; (3) "defendants, as the [Hall Chemical] ESOPs fiduciaries, did not conduct a prudent and independent investigation to determine the fair market value of the stock purchased by the [Hall Chemical] ESOP"; and (4) there was a genuine issue of material fact as to whether a reasonable fiduciary would have relied upon Cunningham's valuation in determining the $3.5 million purchase price for the 110 shares of Hall Chemical. *Hall Holding*, 990 F. Supp. at 960, 961, 964, 965.

On March 10, 1998, upon the Secretary's motion for reconsideration, the district court held that "given the factual findings made by this Court in its [January 9, 1998] order, the Secretary is entitled to summary judgment as a matter of law on her claims under ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D)." *Id*. at 965. Specifically, the district court held that no loss needed to be shown in order to establish a violation of these sections of ERISA; failure to conduct a prudent and independent investigation was enough to establish a violation of § 406(a)(1)(A) and (D). *Id.* at 967.

The district court referred the matter to a magistrate judge for a determination of the fair market value of the 110 shares

district court." *City Mgmt. Corp. v. U.S. Chemical Co., Inc.*, 43 F.3d 244, 251 (6th Cir. 1994). In granting summary judgment, the district court found that defendants violated § 406(a)(1)(A) and § 406(a)(1)(D). *Jordan* and *Compton* are concerned with violations under § 406(a)(1)(D); however, neither case mentions a subjective intent requirement for § 406(a)(1)(A). Regardless of whether defendants had the subjective intent necessitated by *Jordan* and *Compton* in order to prove a violation of § 406(a)(1)(D),[12] the fact

---

[12]Although *Jordan* and *Compton* require a showing of subjective intent to benefit a party in interest for a violation under § 406(a)(1)(D), the Court notes its concern with these holdings. First, there appears to be inconsistencies in the *Jordan* opinion. The opinion states that "[t]his Court, as well as others, have [sic] noted that because § 406(a) characterizes per se violations, it should be interpreted narrowly." *Jordan*, 207 F.3d 858. However, the opinion also states that § 406(a)(1)(D) requires a showing of subjective intent to benefit a party in interest. Stating that § 406(a) "characterizes per se violations," and then holding that a violation of § 406(a)(1)(D) requires a showing of subjective intent, is inherently at odds. This is because a per se violation is a violation "[o]f, in, or by itself; standing alone, without reference to additional facts." BLACK'S LAW DICTIONARY 1162 (7th ed. 1999). Therefore, because it is a per se violation, the parties' intent should have no bearing as to whether a violation occurred.

Second, the panel in *Jordan,* while quoting *Compton*, states there is "strong support for a subjective intent requirement in the language of section 406(a)(1)(D)" and that there is "no contrary evidence in the legislative history." *Jordan*, 207 F.3d at 861 (quoting *Compton* 57 F.3d at 280). However, the Court's review of the legislative history reveals the following:

An additional problem exists because of the present definition of prohibited transactions. Currently, transactions generally are prohibited when the dealings involved are on other than an arm's-length basis. However, *arm's-length standards require substantial enforcement efforts, resulting in sporadic and uncertain effectiveness* of these provisions. This is the same problem which was faced by the Congress in 1969 when it acted with respect to prohibited transactions and private foundations. At that time the Congress concluded that in most cases *arm's-length standards did not preserve the integrity of private*

elements are satisfied: 1) the person or entity is "[a] fiduciary with respect to [the] plan"; 2) the fiduciary "cause[s]" the plan to engage in the transaction at issue; 3) the transaction "use[s]" plan assets; 4) the transaction's use of the assets is "for the benefit of" a party in interest; and 5) the fiduciary "knows or should know" that elements three and four are satisfied.

*Jordan*, 207 F.3d at 860-61 (quoting *Compton*, 57 F. 3d at 278). The panel in *Jordan* explained its reasons for adopting the holding in *Compton*:

The court [in *Compton*] . . . concluded that the fourth element requires a subjective intent to benefit a party in interest. If a showing of subjective intent were not required, "section 406(a)(1)(D) would produce unreasonable consequences that we feel confident Congress could not have wanted." That is, § 406 would prohibit fiduciaries from engaging in transactions that would benefit the plan. "We thus find strong support for a subjective intent requirement in the language of section 406(a)(1)(D), and finding no contrary evidence in the legislative history, we conclude that element four requires proof of a subjective intent to benefit a party in interest."

*Jordan*, 207 F.3d at 861 (internal citations omitted). After noting that the defendants had never challenged the amount of attorney fees or hours, the court found that the "Defendants cannot now assert that they subjectively intended to benefit the [International Brotherhood of Teamsters AFL-CIO] by complying with the attorney's fees agreement in the settlement." *Id.*

Although defendants' argument may give some pause, it is by no means dispositive of the present appeal. This Court reviews "the grant of summary judgment de novo and . . . may affirm on any grounds supported by the record, even though they may be different from the grounds relied on by the

of Hall Holding stock. On December 23, 1998, the magistrate judge issued a report and recommendation after considering the testimony of eight witnesses. The magistrate judge concluded that as of September 28, 1990, the fair market value of the Hall Holding stock was $2,731,174.75.

On August 10, 1999, the district court accepted the magistrate judge's analysis of the parties expert testimony but rejected his final valuation. Consequently, the district court held that the fair market value of 9.96%[7] of Hall Holding stock on September 28, 1990 was $2,450,451.00.[8] This resulted in damages to the Hall Chemical ESOP of $1,049,549.00, which represented the difference between the amount paid by the Hall Chemical ESOP for the Hall Holding stock and the fair market value of the stock as determined by the district court. *See Reich v. Hall Holding Co., Inc.*, 60 F. Supp. 2d 755, 759, 765 (N.D. Ohio 1999).

On September 28, 1999, the district court, on a motion for reconsideration filed by the Secretary, found that the Hall Chemical ESOP was entitled to $1,188,457.70 in prejudgment

[7]The district court explained that the magistrate judge erroneously used 9.9% instead of 9.96%. *See Reich v. Hall Holding*, 60 F. Supp. 2d 755, 759 (N.D. Ohio 1999).

[8]The district court arrived at its valuation of 9.96% of Hall Holding stock by taking Cunningham's valuation ranges of Hall Chemical under three valuation formulas and subtracting: (1) the $13.6 million debt of Hall Holding; and (2) a 13% minority discount to account for the fact that the Hall Chemical ESOP purchased only a minority interest (9.96%) in Hall Holding. The district court then averaged these three ranges, took the lowest value in the range, and then subtracted: (1) negative accounts receivable and liabilities of Hall Holding; (2) 5% marketability discount to reflect that the market for a closed corporation such as Hall Holding is not as readily available as a market for publicly traded stock; and (3) 5% discount to reflect defendant Ahearn's interest in 5% of Hall Chemical stock. Finally, the district court multiplied the final value of Hall Holding stock by 9.96% to reflect the percentage of Hall Holding stock purchased by the Hall Chemical ESOP and rounded that number up to the nearest dollar. *See Hall Holding*, 60 F. Supp. 2d at 759-64.

interest, which, when added to the initial award of $1,049,549, equaled a total award of $2,238,006.70. Finally, on December 20, 1999, the district court issued an order detailing the method in which the $2,238,006.70 award was to be allocated. Specifically, the allocation was to be based upon the amount of stock that a given participant had received or would receive in the future.

As a result of the proceedings before the district court, defendants filed two notices of appeal in this matter. The first notice of appeal was filed on September 9, 1999 and appealed the district court's orders of January 9, 1998, March 10, 1998, and August 10, 1999. The second notice of appeal was filed by defendants on November 23, 1999. This notice appealed the same orders in the first notice of appeal, in addition to the district court's order of September 28, 1999.

## II.  STANDARD OF REVIEW

The Court reviews a district court's decision on a motion for summary judgment de novo, using the same legal standards employed by the district court. *See Henderson v. Ardco, Inc.*, 247 F.3d 645, 649 (6th Cir. 2001). Summary judgment is appropriate only if the answers to interrogatories, depositions, admissions, and pleadings combined with the affidavits in support show that no genuine issue as to any material fact remains and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted). In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

ESOP and defendants' failure to investigate cannot stand because *Kuper* did not contemplate a violation under § 406, and further, requiring such a causal link would be contrary to Congress's creation of per se violations under § 406.

### 3.  *Jordan v. Michigan Conference of Teamsters Welfare Fund*

The third and final case which was relied upon by defendants is *Jordan v. Michigan Conference of Teamsters Welfare Fund*, 207 F.3d 854 (6th Cir. 2000). In their reply brief, defendants assert that this case compels reversal of the district court's decision because there was no showing of a subjective intent to benefit the parties in interest as defendants contend is required under § 406.

In *Jordan*, the plaintiffs brought a class action case against the defendants. The parties resolved the dispute and, as part of the settlement agreement, the defendants agreed to pay the plaintiffs' reasonable attorney's fees. The district court had a hearing during which it certified the class and preliminarily approved the settlement agreement. However, affidavits supporting the request for attorney's fees disclosed that the International Brotherhood of Teamsters AFL-CIO helped to finance the plaintiffs' class action suit. The defendants refused to make any payments to the International Brotherhood of Teamsters AFL-CIO because they believed that such a payment would violate § 406(a)(1)(D), "which prohibits a benefit plan from transferring assets to a party in interest." The district court agreed with the defendants that such a transfer would be a prohibited transaction under § 406(a)(1)(D). *Id.* at 856-58.

However, another panel of this Court disagreed with the district court's conclusion and reversed. That panel adopted the following language in *Reich v. Compton*, 57 F.3d 270 (3d Cir. 1995):

As we read this language [in § 406(a)(1)(D)], it provides that a fiduciary breach occurs when the following five

examining the fiduciary requirements of § 404, but, it did not examine a violation of § 406 because none of the prohibited transactions under § 406 were at issue. Consequently, the Court declines to read a "causation" element into a violation of § 406 because *Kuper* had no intention to do so and such a reading is far beyond the scope of the issues presented in that case.

Further, the Court finds that requiring a causal link between the failure to investigate and the resultant harm in order to prove a violation under § 406 would be contrary to Congress's intent in enacting § 406. Basically, in creating § 406(a), Congress intended to create a category of per se violations. *See Jordan v. Michigan Conference of Teamsters Welfare Fund*, 207 F.3d 854, 858 (6th Cir. 2000). As one court explained, the reasoning for treating a violation of § 406 as a per se violation is as follows:

> "Congress (in ERISA § 406) intended to create an easily applied per se prohibition . . . of certain transactions, no matter how fair, unless the statutory exemption procedures (of ERISA § 408(a)) are followed." *Cutaiar v. Marshall*, 590 F.2d 523, 529-30 (3d Cir. 1979); *see also Eaves v. Penn*, 587 F.2d 453, 457-59 (10th Cir. 1978). Lack of harm to the plan or the good faith or lack of the same on the part of the borrower are not relevant, and certainly not controlling, under ERISA § 406. Rather, "Congress was concerned in ERISA (§ 406) to prevent transactions which offered a high potential for loss of plan assets or for insider abuse . . . ." (*Marshall v. Kelly*, 465 F. Supp. 341, 354 (W.D. Okla.1978)).

*Reich v. Valley Nat. Bank of Arizona*, 837 F. Supp. 1259, 1281 (S.D.N.Y. 1993) (quoting *M & R Invest. Co., Inc. v. Fitzsimmons*, 484 F. Supp. 1041, 1055 (D. Nev. 1980)).

In sum, the claims of error raised by defendants under *Kuper* must fail. Defendants' contention that a causal link must be established between the loss to the Hall Chemical

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324. The nonmoving party must do more than show that there is some metaphysical doubt as to the material facts. *See Matsushita*, 475 U.S. at 586. It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Anderson*, 477 U.S. at 249-50.

### III. LEGAL STANDARDS

#### A. The ERISA Framework

Under ERISA § 406(a), 29 U.S.C. § 1106(a), certain types of transactions between a plan and a party in interest are prohibited. A party in interest is broadly defined to include any fiduciary, a person providing services to the plan, an employer whose employees are covered by the plan, and certain shareholders and relatives. *See* § 3(14)(A)-(F), 29 U.S.C. § 1002(14)(A)-(F). The prohibited transactions between a plan and a party in interest, as set forth in § 406(a), are as follows:

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect–
   (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
   (B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;
(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan; or
(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a). The purpose of § 406(a) is "to prohibit transactions that would clearly injure the plan." *Jordan v. Michigan Conf. of Teamsters Welfare Fund*, 207 F.3d 854, 858 (6th Cir.) (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996)). "Congress adopted § 406 to prevent employee benefit plans from engaging in transactions that would benefit parties in interest at the expense of plan participants and their beneficiaries." *Id.* (citing *Lockheed Corp.*, 517 U.S. at 888).

Although § 406(a) prohibits transactions between an interested party and a plan, there are exceptions to this rule. Under § 408(e)(1) of ERISA, § 406 does not apply to the acquisition or sale by a plan of the employer's securities as long as the acquisition or sale is for "adequate consideration." 29 U.S.C. § 1108(e)(1). The term "adequate consideration" is defined as follows:

[I]n the case of an asset other than a security for which there is a generally recognized market the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary.

29 U.S.C. § 1002(18)(B); *see also Herman v. Mercantile Bank, N.A.*, 143 F.3d 419, 421 (8th Cir. 1998). The impetus behind the exception set forth in § 408(e) and other statutory ESOP provisions was Congress's intent "to encourage employees' ownership of their employer company." *Kuper,* 66 F.3d at 1458.

Quantum's benefit committee testified that they never considered liquidating or diversifying the ESOP's assets during this eighteen month period even though they were aware of the following events that occurred during the period the transfer was pending:

Quantum's recapitalization, which adversely affected Quantum's financial condition by increasing its debt burden, interest expense, and principal repayment; Quantum's decreased operational diversity; a major fire at one of Quantum's plants that hindered the company's production capacity; and a decline in Quantum's net sales and income.

*Id.* at 1450-51.

The plaintiffs filed suit against the defendants and raised multiple claims. All of the claims were dismissed except for the plaintiffs' claims under ERISA, which were based upon the drop of Quantum's stock price during the eighteen-month period the transfer of the ESOP's assets was pending. The positions of the plaintiffs and the defendants were as follows: "Plaintiffs argue that defendants breached their fiduciary duties by failing to diversify or liquidate the ESOP funds during the pendency of the . . . transfer. Defendants counter that the terms of the Plan did not give them any discretion to diversify or liquidate the ESOP funds." *Id.* at 1457. Eventually, the Court held that the "plaintiffs have failed to present sufficient evidence that a reasonable fiduciary would have diversified or liquidated the ESOP. Accordingly, we hold that the district court did not err in determining that [the] defendants' failure to diversify or liquidate the ESOP funds was not a breach of their fiduciary duties." *Id.* at 1460.

As the above-discussion shows, a violation of § 406 was not at issue in *Kuper* because none of the prohibited transactions in § 404(a)(1) was at issue. Instead, at issue in *Kuper* was whether the defendants had violated their fiduciary duties under § 404. The Court spent a great deal of time

hypothetical reasonable fiduciary is irrelevant in determining whether defendants violated § 406(a)(1).

### 2. *Kuper v. Iovenko*

In addition, defendants also argue that were the Court to agree with the district court, it would ignore the holding in *Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir. 1995). In *Kuper*, another panel in this circuit stated:

> However, a fiduciary's failure to investigate an investment decision *alone* is not sufficient to show that the decision was not reasonable. Instead, to show that an investment decision breached a fiduciary's duty to act reasonably in an effort to hold the fiduciary liable for a loss attributable to this investment decision, a plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan.

*Id.* at 1459 (emphasis in original) (citing *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 279 (2d Cir. 1992)). As explained by defendants, a showing of "causation" is required to show a violation of § 406. This Court disagrees with defendants' claim and finds that the holding in *Kuper* is inapplicable to the present case as *Kuper* only addressed violations of § 404, not § 406.

In *Kuper*, this Circuit was faced with the question of whether fiduciaries of an ESOP that only held stock of the employer could be held liable for failing to diversify or liquidate its holdings. In that case, the plaintiffs were employees of a division of Quantum Chemical Corporation (hereinafter "Quantum") that participated in an ESOP. Quantum decided to sell the division in question to another corporation. The transaction was completed on April 17, 1989. However, a transfer of the ESOP's assets to the purchasing corporation was not completed for another eighteen months. During this eighteen month period, the value of Quantum's stock dropped from more than $50.00 a share to a little more than $10.00 a share. Members of

Under ERISA, a plan that primarily invests in the shares of stock of the employer that creates the plan is referred to as an ESOP. *See id.* at 1457. Congress intended ESOPs to function as both "an employee retirement benefit plan and a 'technique of corporate finance' that would encourage employee ownership." *Id.* (quoting *Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir. 1992)). "Because of these dual purposes, ESOPs are not designed to guarantee retirement benefits, and they place employee retirement assets at much greater risk than the typical diversified ERISA plan." *Id.* (citing *Moench v. Robertson*, 62 F.3d 553, 568 (3d Cir. 1995) (quoting *Martin*, 965 F.2d at 664)).

Even though ESOPs can be much riskier than a typical ERISA plan, the fiduciaries of these plans are still held to their fiduciary responsibilities, because the statutory exemptions for ESOPs

> do[ ] not relieve a fiduciary . . . from the general fiduciary responsibility provisions of [29 U.S.C. § 1104] which, among other things, require a fiduciary to discharge his duties respecting the plan solely in the interests of plan participants and beneficiaries and in a prudent fashion . . . nor does it affect the requirement . . . that a plan must be operated for the exclusive benefit of employees and their beneficiaries.

*Kuper*, 66 F.3d at 1458 (quoting *Martin*, 965 F.2d at 665 (quoting 44 Fed. Reg. No. 168 at p. 50,369 (Aug. 28, 1979))). Consequently, the duties required of a fiduciary shall be examined.

### B. Fiduciary Standards under ERISA

"ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). Consequently, ERISA fiduciaries "must act for the exclusive benefit of plan beneficiaries." *Howard v. Shay*, 100

F.3d 1484, 1488 (9th Cir. 1996). The fiduciary duties are set forth in ERISA § 404(a)(1), which states:

. . . [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and–
(A) for the exclusive purpose of:
    (i) providing benefits to participants and their beneficiaries; and
    (ii) defraying reasonable expenses of administering the plan;
(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
(D) in accordance with the documents and instruments governing the plan . . . .

29 U.S.C. § 1104(a)(1). In *Kuper*, another panel of this court explained that the fiduciary duties enumerated under § 404(a)(1) had "three components":

The first is a "duty of loyalty" pursuant to which "all decisions regarding an ERISA plan 'must be made with an eye single to the interests of the participants and beneficiaries.'" *Berlin v. Michigan Bell Tele. Co.*, 858 F.2d 1154, 1162 (6th Cir. 1988) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S. Ct. 488, 74 L. Ed.2d 631 (1982)). The second obligation imposed under ERISA, the "prudent man" obligation, imposes "an unwavering duty" to act both "as a prudent person would act in a similar situation" and "with single-minded devotion" to those same plan participants and beneficiaries. *Id.* Finally, an ERISA fiduciary must "'act for the exclusive purpose'"

their determination of fair market value by way of a prudent investigation in the circumstances then prevailing.

*Id.* at 1467-68 (emphasis in original) (footnotes omitted); *see also Reich v. Valley Nat. Bank of Arizona*, 837 F. Supp. 1259, 1280-81 (S.D.N.Y. 1993).

Returning to the present case, the Court finds that the district court did not err in failing to determine whether a hypothetical reasonable fiduciary would have purchased the Hall Holding stock at the same price. When determining "adequate consideration," § 3(18)(B) requires not only a determination of fair market value, but also an examination of the process that led to the determination of fair market value in light of § 404's fiduciary duties. As the discussion in the prior section demonstrated, defendants did not make a good faith determination as to the price of the Hall Holding stock. This lack of good faith is demonstrated by the following: (1) Defendants' reliance on Cunningham's valuation was improper because Cunningham was not given all of the information he needed to complete the valuation and because he valued the wrong company; (2) the trustees were generally unaware of what was going on; (3) the trustees were not consulted on major decisions, such as the price to pay for Hall Holding stock; (4) there was no negotiation as to the price of the Hall Holding stock; (5) there was more concern for the return on investment for the Master Trust; and (6) the Hall Chemical ESOP was charged several thousand dollars more so that defendants could deal in round numbers.

These facts clearly demonstrate that defendants engaged in a prohibited transaction. Because defendants did not engage in a good faith determination of the fair market value of Hall Holding stock, the definition of "adequate consideration" under § 3(18)(B) was not satisfied. *See* 29 U.S.C. § 1002(18)(B). Therefore, the Court specifically rejects defendants' contention and finds that the price paid by a

consideration" in the closely held corporation situation as "the fair market value of the asset as determined in good faith by the trustee . . . ." 29 U.S.C. § 1002(18)(B). As explained by the dissent in *Mercantile Bank*, the definition of "adequate consideration" has two distinct parts. First, there is the "fair market value" part, then there is the "as determined in good faith by the trustee" part. 29 U.S.C. § 1002(18)(B). However, the majority opinion in *Mercantile Bank* gives no weight to the good faith determination under § 3(18)(B). *See* 29 U.S.C. § 1002(18)(B).

In *Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983), the Fifth Circuit stated that "[t]he focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed." *Id.* at 1467 (quoting 19B S. Young, Business Organizations, § 17.02[3]). The Fifth Circuit then explained that when determining whether "adequate consideration" has been paid, it is not enough that a fiduciary, by chance, arrived at fair market value:

> ERISA's requirement that ESOP fiduciaries purchase employer stock for "adequate consideration" must be interpreted so as to give effect to the Section 404 duties to which those persons remain subject. In this regard, it is especially significant that the adequate consideration test, like the prudent man rule, is expressly focused upon the *conduct* of the fiduciaries. A court reviewing the adequacy of consideration under Section 3(18) is to ask if the price paid is "the fair market value of the asset *as determined in good faith by the . . . fiduciary*," it is not to redetermine the appropriate amount for itself *de novo*. Contrary to the appellees' contentions, this is not a search for subjective good faith--a pure heart and an empty head are not enough. The statutory reference to good faith in Section 3(18) must be read in light of the overriding duties of Section 404. Doing so, we hold that the ESOP fiduciaries will carry their burden to prove that adequate consideration was paid by showing that they arrived at

of providing benefits to plan beneficiaries. *Id.* (quoting [*Bierwirth*], 680 F.2d at 271).

*Kuper*, 66 F.3d at 1458.

Clearly, the duties charged to an ERISA fiduciary are "the highest known to the law." *Howard*, 100 F.3d at 1488 (quoting *Bierwirth*, 680 F.2d at 272 n.8); *see also Moench*, 62 F.3d at 560 (describing a fiduciary's obligations as "strict" and "detailed"). When enforcing these duties, "the court focuses not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction." *Howard*, 100 F.3d at 1488 (citing *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir.1983); *Donovan v. Mazzola*, 716 F.2d 1226, 1233 (9th Cir.1983)). Failure to meet these high standards may result in personal liability for the fiduciary. *See* 29 U.S.C. § 1109(a); *see also Kuper*, 66 F.3d at 1458.

## IV. ANALYSIS

The Court will now turn to the claims of error raised by defendants on appeal. A review of defendants' brief demonstrates that they have three claims of error on appeal, in addition to another matter that was raised in a footnote. The Court will first examine the matter raised by defendants in a footnote, which concerns whether defendant GFGI is a party to this case and whether other defendants are fiduciaries. The Court will then examine defendants' three remaining claims, which are: (1) whether there was a genuine issue of material fact to preclude summary judgment; (2) whether the district court erred in refusing to consider what a reasonable hypothetical fiduciary would have paid for the stock and whether there is a causation element for claims under ERISA § 406(a)(1), 29 U.S.C. § 406(a)(1); and (3) whether the district court's award to the Hall Chemical ESOP participants was proper. As the following discussion will show, defendants cannot prevail on any of their claims.

## A. Defendants' Claims as to Defendant GFGI and Defendants' Fiduciary Status

As an initial matter, the Court will address an issue that could possibly be dispositive as to some defendants. This issue, raised by defendants in a footnote, contends that not all defendants are fiduciaries and that no allegations were made against defendant GFGI. The Court will address each claim in turn.

### 1. Defendant GFGI

Defendants first argue that as to defendant GFGI, the Secretary "made no allegations and sought no relief against defendant GFGI in the count of the complaint dealing with the ESOP purchase of stock: the only mention of defendant GFGI is in count two of the complaint which was voluntarily dismissed by the [Secretary]." The Secretary responds to this argument by noting that it is raised for the first time on appeal. However, the Secretary does acknowledge this "pleading omission."

Generally, "[t]his court will not decide issues or claims not litigated before the district court." *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990) (citing *Boddie v. Am. Broad. Cos., Inc.*, 881 F.2d 267, 268 n. 1 (6th Cir. 1989); *Yeiter v. Secretary Health and Human Servs.*, 818 F.2d 8, 11 (6th Cir. 1987)). "[W]e review the case presented to the district court rather than a better case fashioned after the district court's order." *White*, 899 F.2d at 559 (quoting *Adams v. James*, 784 F.2d 1077, 1080 (11th Cir. 1986)). However, "[w]e have, on occasion, deviated from the general rule in 'exceptional cases or particular circumstances' or when the rule would produce 'a plain miscarriage of justice.'" *Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir. 1993) (internal quotations omitted) (quoting *Pinney Dock and Transport Co. v. Penn Central Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988) (citation omitted) (quoting *Hormel v. Helvering*, 312 U.S. 552, 557, 558 (1941))); *see also Singleton v. Wulff*, 428 U.S.

"self-dealing" and "conflicts of interest." However, Congress created § 408(e) of ERISA, 29 U.S.C. § 1108(e), to provide a narrow exemption to the § 406(a) prohibition. Section 408(e) permits employee benefit plans to purchase or sell employer securities only if the sale or purchase of the securities is for adequate consideration. *The definition of "adequate consideration" under ERISA imposes a two-fold requirement: (1) the price paid must reflect the fair market value of the asset, and (2) the trustee must conduct a careful and independent investigation of the circumstances prevailing at the time of the investment. Donovan v. Cunningham*, 716 F.2d 1455, 1467-68 (5th Cir.1983).

*Id*. at 425 (Bright, J., dissenting) (emphasis added). The dissent concluded that Mercantile Bank violated its duties in three separate ways: (1) by failing to conduct an independent investigation of the transactions at issue and Ford; (2) "by failing to investigate whether the details of the sale transaction would advantage the ESOP employee beneficiaries"; and (3) by failing to correct its past failures when it resumed its position as trustee after Ford's death. *Id*.

After reviewing both positions, the Court finds that the position announced in the dissenting opinion in *Mercantile Bank* is much more persuasive. Were the Court to adopt the position espoused by defendants and the majority in *Mercantile Bank*, the Court would be required to ignore a portion of the definition of "adequate consideration." The Court believes such an interpretation is improper and contrary to Congress's intent.

ERISA § 406(a)(1) prohibits transactions in which an employee benefit plan purchases stock from the employer. 29 U.S.C. § 1106(a)(1). However, the exception to this rule is found in § 408(e), which states that § 406(a)(1) shall not apply if the purchase is for "adequate consideration." 29 U.S.C. § 1108(e). ERISA § 3(18)(B) defines "adequate

*Id*. at 424 (footnote omitted). Finally, Mercantile made no investigation as to its replacement, Mueller, or his intentions. *Id.*

After noting that an ESOP may only purchase an employer's stock for adequate consideration, the Eighth Circuit held:

> Even if a trustee fails to make a good faith effort to determine the fair market value of the stock, "he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway." *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994). Thus, if a prudent trustee would have purchased the Lenco stock for the price for which Mueller purchased it, then Mueller did not violate ERISA, regardless of whether he made a good faith effort to determine the fair market value of the stock.

*Id.* at 421. The Eight Circuit then reviewed the evidence presented at trial. The expert witness for each side presented vastly different values for Lenco. The district court concluded that each expert was credible, and that even if Mueller did overpay, it was only slightly and Mueller had no reason to know the ESOP overpaid for Lenco's stock. The Eight Circuit concluded that "[t]his amounts to a finding that a hypothetical prudent fiduciary in Mueller's place could have and would have paid what Mueller paid for the stock" and therefore ERISA was not violated. *Id.* at 421-22.

Obviously, the dissent disagreed with majority's conclusion. After discussing the high fiduciary standards to which trustees of ESOPs are held, the dissent examined the "adequate consideration" exception to § 406(a)(1)(A) and (D) and the definition of that term:

> ERISA §§ 406(a)(1)(A) and (D), 29 U.S.C. §§ 1106(a)(1)(A) and (D), prohibit a plan from buying or selling securities issued by the plan's employer sponsor because such transactions carry an inherent risk of

106, 121 (1976). Although there are exceptions to this general rule, they are narrow. *See Foster*, 6 F.3d at 407. The Court has discretion to resolve an issue that was not raised before the district court "where the proper resolution is beyond any doubt, or where injustice might otherwise result." *Enertech Elec., Inc. v. Mahoning County Comm'rs*, 85 F.3d 257, 261 (6th Cir. 1996) (citing *Brown v. Crowe*, 963 F.2d 895, 897-98 (6th Cir. 1992); *Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385, 387 (6th Cir.1989)).

After reviewing the arguments presented in the briefs, as well as the record below, the Court finds no reason to address this issue which has been raised for the first time on appeal. As to the issue of whether injustice might result, in *Smith v. CMTA-IAM Pension Trust*, 654 F.2d 650 (9th Cir. 1981), the Ninth Circuit was presented with a situation similar to the present case. In *Smith*, the parties conducted themselves before the district court as though there were an ERISA claim as well as another state law claim. *See id.* at 654 n.2. However, these claims were never presented to the district court. *See id*. Consequently, the "Appellees argue[d] that the ERISA claim [could not] be raised . . . because it was not properly before the district court." *See id*. The Ninth Circuit disagreed, stating:

> Although [the] complaint was never technically amended to include either the ERISA or the state claim, both were fully argued in the parties' pre-hearing memoranda as well as at the motions hearing. While we do not approve of appellant's failure to adhere strictly to the procedures for amendment mandated by FED. R. CIV. P. 15(a), where both parties have fully argued a claim below, we will treat the pleadings as though they have been amended for purposes of appellate review. *See Riley v. MEBA Pension Trust*, 570 F.2d 406, 408 (2d Cir. 1977); *Sherman v. Hallbauer*, 455 F.2d 1236, 1242 (5th Cir. 1972); *Bobrick Corp. v. American Dispenser Co., Inc.*, 377 F.2d 334, 337 (9th Cir. 1967); *Aluminum Co. of America v. Admiral Merch. Motor Freight, Inc.*, 337 F.

Supp. 674, 683-84 (N.D. Ill. 1972), *affirmed*, 486 F.2d 717 [(7th Cir.)], *cert. denied*, 414 U.S. 1113, 94 S. Ct. 843, 38 L. Ed.2d 739 [1973].

*Smith*, 654 F.2d at 654 n.2.

In the present case, no injustice will result because, as in *Smith*, all parties conducted themselves before the district court as though defendant GFGI were a party to this case. First and foremost, defendant GFGI was named in the caption at all stages before the district court. Second, the Secretary's motion for summary judgment and her reply brief treat defendant GFGI as though it is a party, referring collectively to "the defendants." Third, defendants' responsive brief also refers to themselves collectively as defendants. Fourth, the district court's various opinions contemplate that each defendant is a party to the case, as they also refer to "the defendants" collectively. Consequently, because all parties acted as though defendant GFGI was a party, and in such instances other courts have treated the complaint as though it had been amended, *see id.*, the Court finds that no injustice will result from treating defendant GFGI as any other defendant in the present case.

Further, the Court finds the resolution of the issue of whether defendant GFGI is a defendant is not in doubt. Other courts have allowed pleadings to be amended at a very late stage in similar circumstances. *See id.* Therefore, it is quite possible that the Secretary's complaint could be amended at this late stage. Consequently, the Court declines to address the issue of whether defendant GFGI is a proper party in this case because no injustice will result and resolution of the matter would most probably not be in defendant's favor.

it owned 63.2% of the outstanding stock because Lenco had used most of the proceeds of the [bank] loan to Lenco to redeem 230,826 of its previously outstanding shares mostly held by Ford. Even though the ESOP now owned a greater stake in Lenco, Lenco now had extraordinary debt, restrictions on its cash flow as a condition of [a bank] loan, and greatly reduced equity. Before the leveraged buyout, Lenco's total liabilities equaled $1,917,442.00. After the buyout, Lenco's total liabilities tripled to an amount exceeding six million dollars. Before the buyout, Lenco reported an equity (book) value of $5.4 million. The [bank] loan of $5.25 million almost wiped out this equity. Ford added no assets or other equity as part of the buyout. Thus, Lenco went from a substantial business with over five million dollars in equity to a corporation with great debt and practically no equity.

*Id.* at 424 (Bright, J., dissenting) (footnotes omitted). In addition, Mercantile Bank was also the trustee over two testamentary trusts that had been established by the deceased owner of Lenco. The primary asset of these trusts was the majority of voting stock in Lenco. The same person at Mercantile Bank, Jack Niemeyer, was the representative for the ESOP and the trusts on Lenco's board of directors. *Id.* at 423.

Further, the dissent touched upon the minimal amount of investigation undertaken by Mercantile Bank. Although Mercantile Bank conducted a valuation of Lenco prior to the sale and buy-back, it knew little about Ford's financing plans:

Ford provided Mercantile with a copy of a two paragraph, preliminary commitment letter from his financing bank . . . . The letter neglected to identify any terms of the loan, its amount, its borrowing formula, or the interest rate. Mercantile did nothing further to verify the financial feasibility of Ford's takeover of Lenco.

## C. Defendants' Second Claim of Error

Defendants' next claim of error on appeal is that the district court erred in not finding what a hypothetical reasonable fiduciary would have paid for the 110 shares of Hall Holding stock. Essentially, defendants argue that if a hypothetical reasonable fiduciary would have paid the same price for the shares as the Hall Chemical ESOP did, then defendants cannot be liable. However, as the following discussion will show, a violation of § 406 is a per se violation, notwithstanding the price a reasonable hypothetical fiduciary would have paid for the stock.

### 1. *Herman v. Mercantile Bank, N.A.*

In their brief on appeal, defendants rely on *Herman v. Mercantile Bank, N.A.*, 143 F.3d 419 (8th Cir. 1998), in support of their position that the district court erred when it did not make a determination as to the price a reasonable hypothetical fiduciary would have paid. In *Mercantile Bank*, a closely held corporation called Lenco established an ESOP under which its employees owned stock. Mercantile Bank was the ESOP's trustee, and on April 5, 1984, sold the ESOP's stock to a person named Jerry Ford. Apparently, Ford engaged in several transactions which resulted in him owning all of Lenco's stock. On that same day, Mercantile Bank was replaced as the ESOP's trustee by Paul Mueller. The day after these transactions took place, Mueller had the ESOP repurchase the stock from Ford at the same price it had sold the stock on the prior day. In 1985, Mueller passed away, and Mercantile Bank again took over as trustee of the ESOP. Over the next few years, Lenco began to experience financial problems which culminated in filing for bankruptcy on June 20, 1989. *Id.* at 421. In addition to these facts, the dissenting opinion had the following to add:

> Before the ESOP sold its stock to Ford, the ESOP owned 33.3% of the outstanding stock. The next day, when the ESOP bought back the stock for the same price per share,

### 2. Defendants' Fiduciary Status

Defendants also contend that they are not all fiduciaries. With no citation to authority, defendants argue that defendant Hall Holding and defendant Goldman

> were alleged to be fiduciaries solely because they appointed the ESOP trustees, but there is no allegation, and [the Secretary] offered no evidence, that appointing Messrs. Ahearn and Shields was somehow a breach of fiduciary duty or had anything to do with the price paid for the stock.

Defendants also argue that the district court erroneously "assumed" that [defendant] Keating was a fiduciary, which is a complete mischaracterization of the proceedings before the district court. In its opinion, the district court explained its determination as to the issue of defendants' fiduciary status:

> The only argument the defendants make to contest the Secretary's position that each defendant is a fiduciary under ERISA is that the actions and decisions of the defendants surrounding the stock purchase were corporate or sponsor actions not subject to ERISA's fiduciary standards. As discussed above, this argument is rejected. The defendants have not otherwise challenged the Secretary's characterization of them as fiduciaries. In fact, the defendants explicitly state that if the Court does reject their sponsor/fiduciary distinction argument, they "are not afraid to argue this case on the Secretary's theory. . . ." Therefore, in light of the defendants' position and this Court's own legal opinion that the defendants were indeed fiduciaries, the Court holds that the defendants were Hall [Chemical ESOP] fiduciaries during the time in question.

*Reich v. Hall Holding Co.*, 990 F. Supp. 955, 963 n.9 (N.D. Ohio 1998).

It is clear from the district court's opinion that defendants considered the issue of whether they were fiduciaries. Defendants chose to contest their fiduciary status only by arguing that the decisions made concerning the purchase of Hall Holding stock were corporate decisions, not fiduciary decisions. Defendants cannot now hope to argue that they were not fiduciaries at all, because the Court only reviews "the case presented to the district court rather than a better case fashioned after the district court's order." *White*, 899 F.2d at 559 (quoting *Adams*, 784 F.2d at 1080). Consequently, because this issue was not raised before the district court, this Court will not review it for the first time on appeal.

## B. Defendants' First Claim of Error

Defendants' first claim on appeal is that the district court erred in granting summary judgment because there was a genuine issue of material fact as to whether defendants complied with their fiduciary duties. In conjunction with this argument, defendants raise seven different sets of facts[9]

---

[9]Defendants state that the magistrate judge found there is "much evidence" to show that a genuine issue of material fact existed. The phrase "much evidence" is quoted from the magistrate judge's report and recommended decision, in which he states as follows:

> Defendants offered *much evidence* and submitted legal authority which essentially seeks to reargue the liability finding of this court. In an abundance of caution, the evidence was admitted for whatever value it might have on the fair market value issue. After consideration, that evidence is of little or no relevance. The liability issue is beyond the scope of the reference.

(Emphasis added). Defendants' statement that the magistrate judge found "there is 'much evidence' in the record raising genuine issues of material fact in this case" is a mischaracterization of the magistrate judge's statement. The magistrate judge simply stated that defendants *presented* "much evidence." He did not find that there was a genuine issue of material fact, nor did he make any determinations as to the effect or persuasiveness of this evidence at the summary judgment stage. In fact,

as to the price of the Hall Holding stock, there was more concern for the return on investment for the Master Trust, and the inconvenience of dealing with uneven numbers could justify charging the Hall Chemical ESOP an additional $44,900.00 for the stock it purchased. Such facts demonstrate not only the uniquely careless and haphazard manner in which the Hall Chemical ESOP was created, but also clear violations of defendants' fiduciary duties.

In fact, reviewing the discussion in *Kuper* of a fiduciary's duties under § 404(a)(1), it is clear that each of the three duties was breached by at least one defendant in this matter. *See Kuper*, 66 F.3d at 1458. Defendant Keating's testimony that she was more concerned about getting an interest rate favorable to the Master Trust, and the failure of defendant Ahearn or defendant Shields to question this, demonstrate that the duty of loyalty was breached. None of these three defendants acted with an "eye single to the interests" of the Hall Chemical ESOP participants. As to the "prudent man" standard, the trustee's utter failure to be involved in the price charged for the Hall Holding stock demonstrates that this duty was breached. Further, it is difficult to believe that any prudent person would use the valuation of a different company and rely on it when not all relevant information was given to the expert conducting the valuation. Finally, the fiduciaries did not "act for the exclusive purpose" of providing benefits to the Hall Chemical ESOP participants. Instead, the purchase price was rounded up so it was easier to communicate, and the trustees were unaware that any of this was taking place. The decisions were simply made with no input from the people that a had a fiduciary duty to be involved in the decisions. These breaches of fiduciary duty simply reinforce this Court's finding that the district court was correct in granting the Secretary's motion for summary judgment as there are no genuine issues of material fact.

by the amount of stock to be purchased, which defendant Keating erroneously said was 9.9%. The product of these two numbers was 3.4551. However, instead of taking $3.4551 million as the purchase price, the amount was determined to be $3.5 million. Defendant Keating explained:

> Given these values, I would do exactly the same number today, which is almost directly in the middle except it's a round number, so for purposes of communication, purposes of the documentation, it just would work better at 3.5 million than 3.[4551], which is, after all, you know, you know, .1 percent of the transaction or something that we're talking about here.

Essentially, defendant Keating's testimony demonstrates that she was willing to charge the Hall Chemical ESOP an extra $44,900.00, the difference between the actual $3.5 million purchase price and $3,445,100.00, "for purposes of communication."[11]

Again, the Court has held that the above-discussed issues with Cunningham's valuation alone are enough to affirm the district court's holding that a violation of 29 U.S.C. § 1106(a)(1) occurred. Nonetheless, the preceding discussion was intended to show the numerous concerns with the creation of the Hall Chemical ESOP. Essentially, the facts demonstrate that the Hall Chemical ESOP was established in an environment where the trustees were unaware of what was going on, the trustees were not consulted on major decisions affecting the Hall Chemical ESOP, there was no negotiation

---

[11]The Court acknowledges that defendant Keating did not use the proper percentage in her calculations. Defendant Keating used 9.9% to represent the amount of stock that the Hall Chemical ESOP would purchase from Hall Holding. However, the Hall Chemical ESOP purchased 9.96% of Hall Holding's stock. Nonetheless, the Hall Chemical ESOP was overcharged by $23,960.00 so that defendants could deal with round numbers. The $23,960.00 figure is determined by multiplying $34.9 million by 9.96%, and then subtracting the product from $3.5 million.

which they claim demonstrate that a genuine issue of material fact existed. However, after reviewing the record, the Court finds that the district court properly granted the Secretary's motion for summary judgment.

### 1. Defendants' Reliance on Cunningham's Valuation

In an attempt to demonstrate a genuine issue of material fact, defendants first point to Cunningham's valuation. The most troubling aspect of defendants' argument concerning the valuation is their statement that "defendants made sure that Mr. Cunningham had access to all of the information he needed to prepare the valuation." Simply put, this is not true. A review of Cunningham's deposition testimony reveals that he was not fully informed of all circumstances when he completed his valuation of Hall Chemical. Cunningham testified that he was asked by an official at defendant GFGI to do a valuation of Hall Chemical and that he was unaware that the purpose of the valuation "was to establish a value to have an ESOP buy a stake in Hall Chemical." Cunningham also testified that the official at defendant GFGI may have said something about an ESOP, but this "wouldn't have changed how I did the valuation." Asked why this would not have changed the valuation, Cunningham explained that he was not asked to consider the Hall Chemical ESOP. He stated that he "was asked to value Hall Chemical Company. That's all I was asked to do." After this testimony, the following exchange took place between counsel for the Secretary and Cunningham:

> Q. So let's say that I come in and charge you with the following. I want you to conduct a valuation that will tell me how much an ESOP should pay for stock in a company that it wants to buy. Would your valuation be different?

---

the magistrate judge concluded that the "much evidence" submitted by defendants was simply of little or no relevance to the issues before him.

A.   Well, you've asked me a different question.

Q.   That's right.  Would the valuation be different?

A.   Yes.  I would have done a second – probably a second – I would have been forced, had I been willing to take on that assignment, I would have been forced to do a second stage, if you will, valuation.

Q.   And what would that have entailed?

A.   That would have involved what – if Hall Chemical Company is worth X and the ESOP is going to buy some percentage of X, that would have involved what is a minority stake in a privately held company worth.

Q.   And you're saying that you didn't conduct such a valuation because you weren't asked to?

A.   No, I was not asked to.  I didn't do it.

In *Howard v. Shay*, 100 F.3d 1484 (9th Cir. 1996), the Ninth Circuit discussed the use of and reliance upon financial advisors and legal counsel.  "Although securing an independent assessment from a financial advisor or legal counsel is evidence of a thorough investigation, *Martin v. Feilen*, 965 F.2d 660, 670-71 (8th Cir.1992), it is not a complete defense to a charge of imprudence."  *Howard*, 100 F.3d at 1489 (citing *Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir. 1983)).  Further, "independent expert advice is not a 'whitewash.'"  *Id.* (citing *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982); *Donovan v. Walton*, 609 F. Supp. 1221, 1227 n.10 (S.D. Fla. 1985); *Cator v. Herrgott & Wilson, Inc.*, 609 F. Supp. 12, 16 (N.D. Cal. 1984)).  Consequently, the Ninth Circuit promulgated three requirements, which this Court adopts, for a fiduciary of an ESOP when relying upon expert advice:

In addition to the concerns raised by defendant Ahearn and defendant Shields, the deposition testimony of defendant Keating is even more disturbing.  First, defendant Keating testified regarding the loan from the Master Trust to fund the purchase of Hall Holdings shares.  The following exchange took place during defendant Keating's testimony:

Q.   . . . At the time you were considering the ESOPs, loaning, borrowing money to make this purchase, did you have a, a particular interest rate in mind?

A.   From the ESOP standpoint, or from the Master Trust standpoint?

Q.   From the ESOP standpoint.

A.   I was more concerned from the Master Trust standpoint, so no.  I wanted to get a rate that was favorable to the Master Trust.

Defendant Keating also testified that after receiving Cunningham's draft valuation report, she reviewed it and solicited input from defendant Ahearn and Shumaker.  However, she specifically stated that she "most probably" did not speak with the other trustee, defendant Shields, about the draft valuation.

The most disturbing part of defendant Keating's testimony concerned the determination of the price to pay for the Hall Holding stock.  Defendant Keating testified that besides herself, defendant Goldman and maybe one other person was involved in determining the price.  However, neither defendant Ahearn nor defendant Shields, the two trustees, were involved in setting the price.  Finally, defendant Keating's testimony as to how she reached the price of $3.5 million is extremely disconcerting.  This testimony was set forth in the background section, but it bears repeating here.  She testified that the high and low end of Cunningham's valuation range, $32.4 and $37.4 million, were added and divided by two, and the resultant figure, 34.9, was multiplied

The fiduciary must (1) investigate the expert's qualifications . . . (2) provide the expert with complete and accurate information . . . and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances.

*Howard*, 100 F.3d at 1489.

In the present case, the parties do not dispute Cunningham's qualifications to value Hall Chemical. The concern with the valuation comes under the second and third requirements. As to the second requirement, it is clear that Cunningham was not provided with complete and accurate information. His own testimony established that his only job was to valuate Hall Chemical. Cunningham testified that something may have been mentioned about an ESOP, but that, as explained to him, this had no effect on his task of valuating Hall Chemical. Basically, Cunningham was never given the true purpose for which his valuation was to be used. Had Cunningham been given full information, he testified that he would have done a different valuation. In addition to these concerns, Cunningham's valuation did not take into account defendant Ahearn's rights to acquire 5% of Hall Chemical and, as defendant Shields testified, the net liability number that Cunningham used in the valuation failed to account for somewhere between $400,000.00 and $500,000.00.

As to the third requirement, the Court finds that it also has not been satisfied. Reliance upon Cunningham's valuation was not justified under the circumstances present in this case. Cunningham valued Hall Chemical, not Hall Holding. However, Cunningham's valuation of Hall Chemical was used to establish Hall Holding's value. Although it is true that Hall Chemical was the major asset of Hall Holding, the fact remains that Hall Chemical and Hall Holding are two different entities. Therefore, if defendants wished to sell the stock of Hall Holding, then they should have had that company appraised, not Hall Chemical.

As to Cunningham's valuation, defendant Shields testified that he never consulted with Cunningham, had no input into the decision to hire Cunningham, nor did he know what documents Cunningham reviewed in preparation of the valuation. Further, defendant Shields did not know if defendant Ahearn had any input into the decision to hire Cunningham. Defendant Shields believed that defendant Keating was the person that made the arrangements to conduct the valuation. Finally, the following exchange took place between defendant Shields and one of the Secretary's attorneys:

Q.   . . . How was it decided that the ESOP would purchase $3.5 million worth of shares? How did we arrive at that number?

A.   I have no idea.

Q.   You're the trustee of the ESOP, correct?

A.   Uh-huh.

Q.   Or at least at that time you were?

A.   Uh-huh.

Q.   And you don't know how the 3.5 million was arrived at?

A.   I wasn't the owner. I would expect the owner decides how much of the company he's willing to sell.

In *Howard*, the Ninth Circuit was troubled by the fact that "[t]he fiduciaries completed the transaction without negotiation." *Howard*, 100 F.3d at 1489. In the present case, not only did the fiduciaries completely fail to negotiate as to the purchase price for the Hall Holding stock, but they were generally unaware of who determined the purchase price.

In sum, defendants' reliance upon Cunningham's valuation is not a defense in this case. As the previous discussion demonstrated, Cunningham was not provided with complete and accurate information.[10] Further, defendants' reliance on Cunningham's valuation of Hall Chemical in determining Hall Holding's value was not reasonably justified. Instead, defendants' reliance on his valuation was a breach of defendants' fiduciary duties under § 404(a)(1). Specifically, defendants breached the "prudent man" obligation, which the court in *Kuper* explained was one of the duties under § 404(a)(1). In determining the value of the 110 shares of Hall Holding stock, defendants did not act "as a prudent person would act in a similar situation," nor did they act with a "single-minded devotion" to the Hall Chemical ESOP participants. Rather, defendants failed to give Cunningham the information he needed to make a proper valuation, and, without input from any expert, including Cunningham, they assumed that the valuation of Hall Chemical was the same as a valuation of Hall Holding. Consequently, the Court finds these problems alone are enough to affirm the district court's holding. There is no genuine issue of material fact in this case; a violation of 29 U.S.C. § 1106(a)(1) occurred.

---

[10]As discussed above, in their brief on appeal, defendants raise several sets of facts which they claim demonstrate a genuine issue of material fact. Defendants submit that because they reviewed Cunningham's draft valuation, discussed it with outside ERISA counsel, recommended changes to the draft valuation, and reviewed and discussed the final valuation among themselves and with outside ERISA counsel, there is a genuine issue of material fact as to whether they conducted a prudent and independent investigation. However, the Court finds that none of the above-listed facts are relevant to this determination. Because Cunningham's valuation was tainted by the fact that he did not have all of the information he needed, and because the valuation of Hall Chemical was improperly applied to Hall Holding, it did not matter that defendants spent a great deal of time reviewing and recommending changes to Cunningham's valuation. Defendants cannot claim as a defense to this action that a great deal of time was spent reviewing and changing a valuation which was flawed from its inception and performed on the wrong company.

## 2. Other Concerns with Defendants' Determination of the Purchase Price for the Hall Holding Stock

In addition to the issues surrounding Cunningham's valuation, the Court would note several other concerns with the process of determining the price for the 110 shares of Hall Holding stock. First, even though defendant Ahearn and defendant Shields were the trustees of the Hall Chemical ESOP, they had very little to do with the major decisions that concerned it. During his deposition, defendant Ahearn testified that he never consulted with legal counsel concerning the setup of the Hall Chemical ESOP and that he went to one meeting with Shumaker at which defendant Keating and defendant Shields were present. Further, defendant Ahearn also had no input on the price that was to be paid by the Hall Chemical ESOP for the purchase of the Hall Holding shares. Defendant Ahearn testified that he was told that the value for Hall Holding was the midpoint of Cunningham's valuation of Hall Chemical, which was approximately $35 million. Eventually, the $3.5 million purchase price was derived from this midpoint figure; however, defendant Ahearn had no input on these decisions, nor was he aware of how the values were determined.

Defendant Shields testimony is very similar to defendant Ahearn's in that he also had very little input on the Hall Chemical ESOP's purchase of the stock, even though he was a trustee. Initially, defendant Shields testified that the Hall Chemical ESOP was originally going to purchase stock in Hall Chemical. At some later date, the decision was made to purchase stock in Hall Holding instead. Defendant Shields testified that defendant Keating made the decision to purchase stock in Hall Holding and that he did not help make that decision. In addition, Article 11.4 of the Hall Chemical Company Employee Stock Participation Plan requires that "[t]he company shall notify the Trustee of the identity of the Administrator . . . ." However, defendant Shields testified that as to his recollection, he did not remember an administrator being appointed.