In re: CALUMET FARM, INC., Debtor

Phoenix Corporation, Plaintiff–
Appellant,

v.

William M. Allen, Defendant–Appellee.

No. 01–5144.

United States Court of Appeals,
Sixth Circuit.

Sept. 10, 2002.

Before BOGGS and BATCHELDER, Circuit Judges; and STEEH, District Judge.*

PER CURIAM.

Plaintiff Phoenix Corporation, debtor-in-possession for Calumet Farm, Inc., appeals a district court decision affirming a bankruptcy court's grant of summary judgment to William Allen in this action for fraudulent conveyance of interests in various racehorses and broodmares. 11 U.S.C. § 544(b). We affirm the bankruptcy court's grant of summary judgment, because there is no genuine issue of material fact between the parties, and Allen is prop-

---

* The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

erly entitled to judgment as a matter of law.

## I

Calumet Farm and Allen engaged in several transactions regarding the breeding of horses and the sale of interests in broodmares and racehorses between 1985 and July 11, 1991, when Calumet filed for bankruptcy under Chapter 11. Phoenix claims that Allen defrauded Calumet in two of the transactions.

The first transaction took place on September 21, 1988. One of Allen's mares died, and Allen was obliged to reinvest the insurance proceeds to avoid realizing a gain for tax purposes. Allen therefore bought four broodmares (Lucinda Lea, Spring Sunshine, Moonbeam, and Royal Entrance), for $3,000,000. The transaction is evidenced by Bills of Sale executed by Calumet, and by four promissory notes executed by Allen. The promissory notes were for Royal Entrance for $500,000, Spring Sunshine for $500,000, Moonbeam for $500,000, and Lucinda Lea for $1,500,000. The prices paid for the mares were exorbitant—as a point of comparison, Lucinda Lea was appraised at $400,000 while in foal in early 1989. Lucinda Lea was the youngest of the four at 13 years old; the rest were over 20 years old. The mares were boarded at Calumet. Calumet and Allen also executed a Limited Price Put Option Agreement, which granted Allen the option to sell the broodmares back to Calumet between December 31, 1988 and October 1, 1989 at either the contract price or the current market value of the mares, whichever was greater.

On November 1, 1988, Calumet sent Allen a letter, which read:

> In the event that one or more of the [four] broodmares should die prior to the exercise by you of the Limited Put Option, Calumet Farm, Inc. agrees to indemnify and hold you harmless from any loss or expense associated with the loss of such horse and shall cancel that portion of the promissory note representing the purchase price of such horse . . . .

On February 2, 1989, the parties entered into an agreement terminating the September 21, 1988 agreement. Under this "Release and Termination of Contract," Allen exercised his right to return Lucinda Lea. The release provided for cancellation of Allen's note to Calumet for the purchase price. Allen made out a bill of sale for Lucinda Lea, signed and dated February 2.

On March 30, 1989, Allen conveyed the other three broodmares back to Calumet in exchange for the cancellation of the three $500,000 notes. He also executed a bill of sale, conveying Lucinda Lea to Calumet, even though she had already purportedly been conveyed by the February 2 rescission and bill of sale. On April 1, 1989, the very next day, Allen repurchased the same three mares, for $1,500,000, executing a promissory note to that effect; Calumet executed bills of sale on the mares. Allen finally executed a note to Calumet for $92,375, representing interest on the three notes. Allen paid this note in full.

Lucinda Lea underwent major surgery on March 20, 1989, and died of a ruptured stomach on May 1, 1989. Phoenix claims that Allen owned Lucinda Lea when she died, and that the February conveyance back to Calumet was fraudulent and back-dated. Further, Phoenix claims that the purchase price when Calumet repurchased the mare ($1.5 million dollars, based on the cancellation of the Allen note) was grossly inflated compared to the market value of the mare.

The second transaction of which Phoenix complains is more complicated. On April 1, 1989, the same date that Allen repurchased the three broodmares from Calumet, Allen and Calumet entered into another horse trade, this time regarding horses that Allen had bought from Florida thoroughbred farms. Under this agreement, Calumet purchased five broodmares from Allen, and a 50% interest in 8 two-year-old racehorses. For these interests, Calumet paid $1,832,375, plus the assignment of an account receivable for stallion nominations (breedings) to Alydar and Secreto owed by a third party, Woodrow Marriott, plus nominations to Alydar for three years: 1990, 1991, and 1992. Calumet executed three promissory notes for $1,500,000, $240,000 and $92,375.

Calumet and Allen then entered a partnership agreement, forming the Calallen partnership. Calumet donated its interest in the broodmares and the half interest in the racehorses to the partnership; Allen donated his half interest in the eight racehorses as well. Calumet was clearly the majority investor in the partnership—the capital contribution listed in the 1989 tax return stated Calumet's contribution as $1,582,452, while Allen's contribution was listed as $161,053. Apparently, the horses were raced under Allen's supervision.

Alydar died in November 1990, prior to the 1991 breeding season. On December 1, 1990, Allen and Calumet dissolved the partnership by means of a "Memo of Understanding," with three provisions. First, the partners canceled two $1.5 million dollar notes: the note from Allen repurchasing the three Calumet broodmares, balanced against the $1.5 million dollar note executed by Calumet as part of the Calallen horse purchase. Second, Allen was permitted to trade the additional Calumet notes from the Calallen transaction, totaling $332,375, for horses, services, or nomi-

nations owned by Calumet. Third, Allen surrendered any claims to the Marriott receivable. Finally, the memorandum granted Allen one nomination to Criminal Type, in partial compensation for the loss of two Alydar nominations.

In 1991, Calumet filed for Chapter 11 bankruptcy. After the farm was sold, Calumet changed its name to Phoenix Corporation, and remained as debtor in possession. In 1996, Phoenix brought the current action, seeking a declaration that the two transactions constituted a conveyance of assets made for the purpose of defrauding Calumet's creditors. In June 1999, the bankruptcy court held a hearing on the parties' cross motions for summary judgment, and on March 27, 2000, granted Allen's motion for summary judgment on all counts. Phoenix appealed the bankruptcy court's decision to federal district court; the district court affirmed on December 29, 2000. Phoenix timely appealed.

## II

### 1. Standard of Review

Circuit and district courts review *de novo* a bankruptcy court grant of summary judgment, including the underlying determination of whether a genuine issue of material fact exists between the parties. *In re Madaj*, 149 F.3d 467, 468 (6th Cir. 1998). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). In evaluating a grant of summary judgment, the reviewing court must make all reasonable inferences in favor of the non-moving party. *Napier v. Madison County*, 238 F.3d 739, 740–41 (6th Cir.2001).

Phoenix states, correctly, that the question of whether summary judgment was properly granted is a question of law, and that the district court in this case erred when it reviewed the bankruptcy court's judgment for clear error rather than *de novo*. However, there is no need to remand the case, as our precedent instructs us to review the determination of the bankruptcy court directly. *In re Cannon*, 277 F.3d 838 (6th Cir.2002), held:

> When we review appeals from the decisions of a district court in a case originating in bankruptcy court, we directly review the decision of the bankruptcy court rather than the district court's review of the bankruptcy court's decision. Because we find ourselves in essentially the same position as the district court in reviewing the bankruptcy court's decision, we accord no deference to the district court's decision.

*Id.* at 849 (citations omitted).

We therefore proceed to review the bankruptcy court's determination directly. Although we may not weigh evidence at the summary judgment phase, the party seeking to avoid summary judgment must produce evidence in opposition to the motion that raises more than a metaphysical doubt as to an issue of material fact. *Chao v. Hall Holding Co.*, 285 F.3d 415 (6th Cir.2002). A non-movant must assert "significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion ...." *Chao*, 285 F.3d at 424. With this standard in mind, we examine each of Phoenix's arguments in turn.

**2. The First Transaction (Lucinda Lea)**

Phoenix brought suit under 11 U.S.C. § 544(b), which allows a debtor in possession to bring an adversarial proceeding in order to void fraudulent transfers. The section reads: "[T]he trustee may void any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law ...." 11 U.S.C. § 544(b)(1).

Phoenix claims that the repurchase of Lucinda Lea and the concurrent cancellation of the Allen notes are voidable under Kentucky Revised Statutes § 378.010, which prevents transfers or conveyances "with the intent to delay, hinder or defraud creditors," and § 378.020, which grants priority to senior creditors over subsequent transfers from the debtor's estate that lack consideration.[1]

■ Phoenix's complaint as to the first transaction is twofold. First, Phoenix alleges that when Allen reconveyed Lucinda Lea to Calumet under the Limited Price Put option, he sold her for far more than she was worth. Counsel argued before the bankruptcy court that Lucinda Lea was worth only $400,000 even when in foal, and that her effective resale to Calumet under the Limited Price Put option for $1.5 million dollars was fraudulent. However, as

---

1. K.R.S. § 378.010 reads, in relevant part:

   Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, or right or thing in action, or any rent or profit thereof, made with the intent to delay, hinder or defraud creditors, purchasers or other persons, and every bond or other evidence of debt given, action commenced or judgment suffered, with like intent, shall be void as against such creditors, purchasers and other persons.

   K.R.S. § 378.020 reads:

   Every gift, conveyance, assignment, transfer or charge made by a debtor, of or upon any of his estate without valuable consideration therefor, shall be void as to all his then existing creditors, but shall not, on that account alone, be void as to creditors whose claims are thereafter contracted, nor as to purchasers from the debtor with notice of the voluntary alienation or charge.

the bankruptcy court correctly noted, all that this demonstrates is that Allen agreed to pay a similarly inflated price ($1.5 million) for Lucinda Lea at the outset. The reconveyance was merely a reversal of the original transaction. Phoenix has no claim for fraudulent conveyance based on the resale price.

Second, Phoenix seeks to avoid the repurchase of Lucinda Lea as fraudulent, by arguing that Lucinda Lea died before Allen reconveyed her. Phoenix hopes to defeat the sale by arguing that there is a genuine issue of material fact as to whether Allen conveyed Lucinda Lea before her death. Phoenix first argues that there was a genuine issue of material fact as to the existence of the Limited Put Agreement, because a CPA auditor for Calumet had not seen the agreement. The fact that a third party has not seen or was not told about a contract does not raise doubt as to its existence. The parties produced multiple copies of the contract, and the parties acted consistently with its existence.

Phoenix next argues that it has raised a genuine issue of material fact as to whether Allen owned Lucinda Lea on May 1, 1989, because the Allen promissory note was still on Calumet's books in May 1989. We disagree that Calumet's failure to cancel the note on its books raises a genuine issue of material fact as to the date of conveyance. The records were not up to date, and specifically stated: "some of the notes may be outdated and replaced by new notes." The records were also conflicting: although the Lucinda Lea note was still listed on Calumet's books as outstanding in May of 1989, the paper document itself was marked "canceled" on Feb-

ruary 15, 1989 by Calumet's president, J.T. Lundy. Phoenix does not explain this contradiction.

However, even assuming that the Calumet records were correct, Calumet's books have no bearing on the legal sufficiency of the February 2 transfer agreement, or the existence of the put option. Calumet's books do have some bearing on the question of whether Allen exercised his option before May, but only indirectly, since Allen's notes were to be canceled only as a result of the transfer of Lucinda Lea. Phoenix's argument, that the transfer was not completed because Calumet did not timely abide by its contractual obligation to cancel Allen's note, fails to raise a genuine issue of material fact as to whether or not Lucinda Lea was indeed transferred on February 2.[2]

The reconveyance contract, executed February 2, and relied on by the bankruptcy court, purported to convey Lucinda Lea back to Calumet three months before her death. Allen executed a bill of sale for Lucinda Lea on February 2. Allen also executed a (seemingly redundant) bill of sale for Lucinda Lea as part of the March 30, 1989 reconveyance of the other three broodmares to Calumet. Phoenix presents no argument or evidence directly undermining the reconveyance contract or bills of sale.

There are other indicia of Calumet's ownership of Lucinda Lea after February. Lucinda Lea had a foal on March 19, 1989, called House Dressing, which Calumet sold. Calumet retained all of the proceeds from the sale. After Lucinda Lea died,

---

**2.** Phoenix also asserts that Calumet's CFO extended interest payments on the Lucinda Lea note in April of 1989 as evidence that Lucinda Lea was not transferred until after her death. This argument also fails. Standing alone, the non-occurrence of a down-stream obligation (here, Calumet's obligation to cancel Allen's note, and stop charging interest on it) does not create more than a metaphysical doubt that the prior triggering condition (here, Allen's exercise of the option) did not occur.

Calumet collected one million dollars in insurance.[3] At the very most, the reconveyance of Lucinda Lea, if dated to March 30 rather than to February 2, and if made in contemplation of Lucinda Lea's death, was a fraud on the insurance company (and not Calumet's creditors) for Calumet's benefit.

The bankruptcy court determined that Phoenix had not raised sufficient doubt as to the date of transfer to resist summary judgment. The contracts presented by Allen enjoyed a presumption of validity, the court noted, that was not challenged by any of the evidence presented by Phoenix. In light of the contracts, bills of sale, collection of insurance, and sale of the March 19 foal, the bankruptcy court correctly decided that Phoenix's evidence raises no more than a metaphysical doubt as to the date of Lucinda Lea's transfer. We agree, and affirm the grant of summary judgment as to the first transaction.

### 3. The Second Transaction (Calallen Partnership)

Phoenix's complaint as to the second transaction is that Calumet agreed to pay Allen far more for its share in the Calallen horses than it was worth. Allen, Phoenix argues, received $2,567,375 worth of combined value from the Calumet notes, the Mariott receivable, and the Alydar nominations. Phoenix argues that the horses were worth about $221,000.

However, as the bankruptcy court noted, despite the high purchase price, Calumet paid almost none of that amount. The $1.5 million dollar note was canceled in exchange for the Allen note of the same amount, effecting a trade of interests in three broodmares for interests in 13 racehorses and mares. The other two notes were not paid.

The only ascertainable value Allen received from the Calallen partnership consisted of breedings to Calumet stallions; even then, when an Alydar foal was conceived, Calumet sold the foal and retained the proceeds. Calumet did not pay on the notes executed in the Calallen transaction. Regardless of the complexity or even seeming duplicity of the transactions, Phoenix cannot recover amounts of which it was not defrauded.

Phoenix asserts that we may only consider the Calallen deal as of the time of the original Calallen transactions, on April 1, 1989, and may not consider the fact that Calumet actually paid nothing on the notes that it executed. *Campbell v. First Nat. Bank*, 234 Ky. 697, 701, 27 S.W.2d 975 (1930). Phoenix argues that the date of the transfer is the "critical date against

3. The parties disagree as to the import of the insurance policy. Calumet maintained an insurance policy on Lucinda Lea throughout the period of Allen's ownership. Calumet collected on this policy at her death. Although the parties assert that Calumet could have insured its possessory interest in Lucinda Lea during this time, this contradicts the terms of the insurance policy. The insurance policy seems to be a straightforward insurance of an ownership, not a possessory, interest. The policy reads:

It is a condition precedent to any liability of the Underwriters hereunder that at the commencement of this Insurance the Assured is the *sole* owner of each animal hereby insured. This insurance shall cease to cover an animal immediately if the Assured sells it or *parts with any interest in it whatsoever*, whether temporarily or permanently.

(emphasis added). The relevant coverage seems to have run from February 10, 1989 to February 10, 1990. If Lucinda Lea were resold to Calumet on February 2 as Allen claims, she would be covered under the insurance contract, because Calumet owned her at the February 10 inception of the contract. Despite Phoenix's arguments, therefore, Calumet's collection of insurance for the death of Lucinda Lea is strong evidence of ownership.

which the validity of the transfer must be tested." 37 Am.Jur.2d *Fraudulent Conveyances* § 18 (1988). As a result, Phoenix asserts, we are constrained to find that there was a fraudulent conveyance of assets on April 1, 1989, because at the time of the original Calallen transaction, Calumet promised to exchange notes, goods and services that Phoenix valued at $2,567,375 for $221,000 worth of horses.

We disagree. The conveyance of which Phoenix complains is actually the *offset*, by Allen, of debt stemming from the purchase of the three mares. That offset occurred as part of the December 1, 1990 Memorandum of Understanding, in which the matching $1.5 million dollar notes first generated and exchanged on April 1, 1989 were mutually canceled. We therefore evaluate the transfer as of the date of the offset.

The gains from the Calallen partnership were not disparate. Allen received breeding rights, which were substantially disrupted by the death of Alydar in 1990. Calumet received interests in a mediocre batch of horses. The bankruptcy court correctly concluded that the claims by Phoenix for board, care, and other services given to Allen horses did not exceed the $332,375 amount that Allen was allowed to offset under the contract. The bankruptcy court therefore correctly held that the execution of the three notes by Calumet did not "result[ ] in a 'transfer' or 'parting with property' by the debtor in view of the fact that nothing was paid on the notes," nor did they represent a transfer without consideration. The only asset arguably "parted with" was the $1.5 million dollar note that Calumet released, which was made in exchange for Allen's release of a note in the same amount. This exchange was not a fraudulent transfer as defined by K.R.S. § 378.010, or a transfer by a debtor without consideration under K.R.S. § 378.020;

we therefore affirm the bankruptcy court's grant of summary judgment as to the second transaction.

### III

For the above reasons, the judgment of the bankruptcy court is AFFIRMED.